Jerome Thomas LAMPRECHT,
Appellant,

v.

FEDERAL COMMUNICATIONS
COMMISSION, Appellee,

Barbara Driscoll Marmet and
Dragon Communications,
Inc., Intervenors.

No. 88–1395.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 25, 1991.

Decided Feb. 19, 1992.

Michael A. Carvin, with whom Michael P. McDonald, Washington, D.C., was on the brief, for appellant.

C. Grey Pash, Jr., Counsel, F.C.C., Washington, D.C., for appellee. With him on the brief, were Robert L. Pettit, Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, and Laurel R. Bergold, Counsel, F.C.C., Washington, D.C.

Robert Lewis Thompson, Washington, D.C., was on the brief, for intervenor Dragon Communications, Inc.

Harold K. McCombs, Jr., Washington, D.C., entered an appearance, for intervenor Barbara Driscoll Marmet.

Before MIKVA, Chief Judge, BUCKLEY, Circuit Judge, and THOMAS, Circuit Justice.*

Opinion for the Court filed by Circuit Justice THOMAS.

Concurring opinion filed by Circuit Judge BUCKLEY.

Dissenting opinion filed by Chief Judge MIKVA.

THOMAS, Circuit Justice:

When Barbara Driscoll Marmet applied for permission to build a radio station, the Federal Communications Commission, pursuant to policy, awarded her extra credit for being a woman. Jerome Thomas Lamprecht contends that the Commission's policy deprived him of his constitutional right to the equal protection of the laws. We agree.

I

A

The Communications Act of 1934, Pub.L. No. 73–416, 48 Stat. 1064 (codified as amended in scattered sections of 47 U.S.C.), empowers the Federal Communications Commission to grant construction permits and operation licenses for radio and television stations when "public convenience, interest, or necessity will be served thereby." 47 U.S.C. §§ 307(a), 309(a); see also *id.* § 303. In 1965, the Commission first set out the general policy that it follows when it entertains mutually exclusive applications. *Policy Statement on Comparative Broadcast Hearings*, 1 F.C.C.2d 393 (1965), modified, 2 F.C.C.2d 667 (1966). Two principal goals guide the Commission in its choice. In furthering the first objective, "a maximum diffusion of control of the media of mass communications," the Commission examines each applicant's interests in other media properties, taking into account the significance of the other media properties and the extent of the applicant's interests. See 1 F.C.C.2d, at 394–95. In furthering the second objective, "the best practicable service to the public," the Commission awards what it calls "quantitative-integration credit," a term of art that describes the degree to which prospective owners will participate in their stations' day-to-day management. See *id.*

* Justice Thomas was a member of this court when the case was briefed and argued and is designated today a Circuit Justice of this circuit. See 28 U.S.C. §§ 42, 43(b).

The Commission then "enhances" the quantitative-integration credit based on "qualitative" factors, such as an owner's character and the service an owner proposes to offer, as well as (to the extent applicable) an owner's local residence, involvement in civic affairs, and experience and education in broadcasting. See *id.*, at 396–99.

In 1972, the Commission's Review Board held that it was barred by statute from giving applicants qualitative-enhancement credit for being members of particular racial or ethnic groups. See *Mid–Florida Television Corp.*, 33 F.C.C.2d 1, 17 (Rev. Bd.), review denied, 37 F.C.C.2d 559 (1972). This court disagreed. See *TV 9, Inc. v. FCC*, 495 F.2d 929 (D.C.Cir.1973) (reversing *Mid–Florida*), cert. denied, 419 U.S. 986, 95 S.Ct. 245, 42 L.Ed.2d 194 (1974). A later case clarified that in this circuit's view the public-interest mandate of the Communications Act in effect *requires* the Commission to award applicants credit for being minorities. See *Garrett v. FCC*, 513 F.2d 1056, 1063 (D.C.Cir.1975); see also *West Michigan Broadcasting Co. v. FCC*, 735 F.2d 601, 609–11 (D.C.Cir.1984), cert. denied, 470 U.S. 1027, 105 S.Ct. 1392, 84 L.Ed.2d 782 (1985). In 1978, the Commission reacted to *TV 9* and *Garrett* by expressly adopting three programs: the awarding of tax certificates, the holding of distress sales, and the giving of preferences in the comparative-licensing process. See *Statement of Policy on Minority Ownership of Broadcasting Facilities*, 68 F.C.C.2d 979, 982–83 (1978); *WPIX, Inc.*, 68 F.C.C.2d 381, 411–12 (1978); see also *Reexamination of the Commission's Comparative Licensing, Distress Sales and Tax Certificate Policies Premised on Racial, Ethnic or Gender Classifications*, 1 F.C.C. Rcd. 1315, 1315 (1986) (notice of inquiry), modified, 2 F.C.C. Rcd. 2377 (1987). Each of the three programs was meant to benefit members of only certain minority groups, specifically people of "Black, Hispanic Surnamed, American Eskimo, Aleut, American Indian and Asiatic American extraction." *Statement of Policy on Minority Ownership*, 68 F.C.C.2d, at 980 n. 8.

Women fared differently. In June 1978, the Review Board decided "[u]pon further reflection," but without explanation, to give preferences to women in its comparative-licensing program. *Gainesville Media, Inc.*, 70 F.C.C.2d 143, 149 (Rev.Bd. 1978). Early the next month, the Board offered reasons in support of its policy:

> We hold that merit for female ownership and participation is warranted upon essentially the same basis as the merit given for black ownership and participation, but that it is a merit of lesser significance. The basic policy considerations are the same. Women are a general population group which has suffered from a discriminatory attitude in various fields of activity, and one which, partly as a consequence, has certain separate needs and interests with respect to which the inclusion of women in broadcast ownership and operation can be of value. On the other hand, it is equally obvious that the need for diversity and sensitivity reflected in the structure of a broadcast station is not so pressing with respect to women as it is with respect to blacks— women have not been excluded from the mainstream of society as have black people.

*Mid–Florida Television Corp.*, 70 F.C.C.2d 281, 326 (Rev.Bd.1978), set aside on other grounds, 87 F.C.C.2d 203 (1981). Later that year, however, the Commission decided that women who are not also minorities may not participate in the tax-certificate or distress-sale programs. See *National Telecommunications & Information Admin.*, 69 F.C.C.2d 1591, 1593 n. 8 (1978) (petition for notice of inquiry) (stating that "we have not concluded that the historical and contemporary disadvantagement [sic] suffered by women is of the same order, or has the same contemporary consequences, which would justify inclusion of a majority of the nation's population in a preferential category defined by the presence of 'minority groups' "); see also *Wuenschel Broadcasting Co.*, 74 F.C.C.2d 389 (1979) (refusing to include women in a program that expedites the processing of minorities' applications).

In 1983, James U. Steele was denied a construction permit in a case in which the sex of a competing applicant proved to be "decisively important." *Cannon's Point Broadcasting Co.*, 93 F.C.C.2d 643, 656–57 (Rev.Bd.1983), review denied, No. 86–161 (Comm'n Apr. 13, 1984). Steele then challenged the Commission's sex-conscious policy in this court. In *Steele v. FCC*, we struck the policy down. 770 F.2d 1192 (D.C.Cir.1985) (reversing *Cannon's Point*). Noting first that the Review Board's reasoning had been unclear, Judge Tamm, joined by Judge Scalia, accepted the Commission's assertion that it sought to increase the quantity of women's viewpoints on the air. Comparing the Commission's ethnic-preference policy, the court then asked whether a station owner with ancestors from Italy, for example, "would primarily program Italian operas or would eschew Wagner in favor of Verdi," *id.*, at 1198, an assumption based in turn on two other presumed truths: that a station owner's heritage will determine the owner's interests, and that a station owner will indulge his or her own tastes and ignore the tastes of the members of the relevant programming audience.

> Whatever the merit of these assumptions as applied to cohesive ethnic cultures, it simply is not reasonable to expect that granting preferences to women will increase programming diversity. Women transcend ethnic, religious, and other cultural barriers. In their social and political opinions and beliefs, for example, women in fact appear to be just as divided among themselves as are men. Therefore it is not reasonable to expect that a woman would manifest a distinctly "female" viewpoint.

*Id.*, at 1199. We concluded that the policy violated the Communications Act. "Presumably, the Board thought that [its policy] was a Good Idea and would lead to a Better World. [But] a mandate to serve the public interest is not a license to conduct experiments in social engineering conceived seemingly by whim and rationalized by conclusory dicta." *Id.*

A majority of the active judges in the circuit then voted to rehear the case en banc and vacated the panel's opinion and judgment. *Steele v. FCC*, No. 84–1176 (D.C.Cir. Oct. 31, 1985) (en banc). After the court instructed the parties to file supplemental briefs, the Commission responded by admitting that it had assumed, with no factual support, a causal link between its preference schemes and increased diversity of viewpoints. See Brief for the Federal Communications Commission at 17–30, *Steele v. FCC* (D.C.Cir.) (No. 84–1176) (en banc). The Commission acknowledged that it thought its race- and sex-preference policies contrary to both the Communications Act and the Constitution, and it asked us to remand the *Steele* case for reconsideration. We granted the motion, and the Commission proceeded to call for comments on the wisdom and effectiveness of its policies. See *Reexamination of the Commission's Comparative Licensing, Distress Sales and Tax Certificate Policies Premised on Racial, Ethnic or Gender Classifications*, 1 F.C.C. Rcd. 1315 (1986) (notice of inquiry), modified, 2 F.C.C. Rcd. 2377 (1987).

Soon after the Commission began to try to make a record, however, Congress ordered it to freeze. In a rider to the Continuing Appropriations Act for Fiscal Year 1988, Congress instructed that "none of the funds appropriated by this Act shall be used to repeal, to retroactively apply changes in, or to continue a reexamination of, the policies of the ... Commission with respect to comparative licensing, distress sales and tax certificates ... to expand minority and women ownership of broadcasting licenses ... other than to close [the pending reexamination] with a reinstatement of prior policy." Pub.L. No. 100–202, 101 Stat. 1329, 1329–1331 (1987). Congress has passed identical riders in each year since. See Pub.L. No. 101–515, 104 Stat. 2101, 2136–2137 (1990); Pub.L. No. 101–162, 103 Stat. 988, 1020–1021 (1989); Pub.L. No. 100–459, 102 Stat. 2186, 2216–2217 (1988). Obeying Congress's order, the Commission continues to apply its preference policies. See, *e.g.*, *Cannon's Point Broadcasting Co.*, 3 F.C.C. Rcd. 864 (1988) (reaffirming the original decision, including the sex preference, after the remand in

*Steele*); see also *James U. Steele*, 4 F.C.C. Rcd. 4700 (1989), reaff'd, 5 F.C.C. Rcd. 4121 (1990).

Disappointed applicants meanwhile continued to challenge the Commission's policies on both constitutional and statutory grounds. In *Shurberg Broadcasting, Inc. v. FCC*, 876 F.2d 902 (D.C.Cir.1989), a divided panel of this court struck down as unconstitutional the Commission's distress-sale program, and in *Winter Park Communications, Inc. v. FCC*, 873 F.2d 347 (D.C.Cir.1989), a divided panel upheld on statutory and constitutional grounds the Commission's comparative-licensing program for racial and ethnic minorities. In *Metro Broadcasting, Inc. v. FCC*, 497 U.S. 547, 110 S.Ct. 2997, 111 L.Ed.2d 445 (1990), the Supreme Court reversed *Shurberg* and affirmed *Winter Park*, thus upholding two of the Commission's methods for preferring applicants on the basis of race, ethnicity, or surname. The *Metro Broadcasting* Court expressly refused to pass judgment on the Commission's policy of preferring

applicants on the basis of sex. See 110 S.Ct., at 3005 n. 7 ("[T]he Commission's gender preference policy is not before us today.").[1] We had previously held this case in abeyance, and we reopened proceedings after the Supreme Court's decision.

B

This case began in 1982, when Jerome Thomas Lamprecht, Barbara Driscoll Marmet, Dragon Communications, Inc., and Port Royal Broadcasting, Inc. filed mutually exclusive applications to build a radio station that would broadcast on channel 276A (103.1 MHz), out of Middletown, Maryland. Discovery ensued and ended early in 1984. The record reveals the following facts.

Jerome Thomas Lamprecht, of Baltimore, Maryland, was twenty-seven when he applied for the construction permit. Lamprecht attended the University of Maryland full-time from 1974–1977 and part-time from 1977–1984. He graduated in

1. Our dissenting colleague suggests throughout that the Supreme Court already has decided that the Commission's sex-based policy passes constitutional muster. "[A]s a matter of law," he writes, "the constitutionality of this affirmative action program is clear—at least until the Supreme Court overturns *Metro*." *Post*, at 415. "In striking down the preference policy," he writes, "my colleagues have done precisely what the Supreme Court forbids them to do." *Post*, at 404. And "it strikes me as impossible," our colleague writes, "to reconcile the Supreme Court's decision in *Metro Broadcasting* with [this court's] decision today." *Post*, at 404. With all due respect, we think it impossible to reconcile our dissenting colleague's suggestion with the unambiguous reservation of *Metro Broadcasting* itself: "[T]he Commission's gender preference policy is not before us today." 110 S.Ct., at 3005 n. 7.

The Commission's gender-preference policy is, however, before us today, and though its subject may challenge certain articles of faith, this case deserves the fair, careful, and dispassionate treatment that we try to accord all of the cases we decide. Our dissenting colleague nonetheless accuses us of "telling the first branch how to make national policy," *post*, at 415, and of "pay[ing] lip service to Justice Brennan's majority opinion" in *Metro Broadcasting* while "apply[ing] in practice ... Justice O'Connor's dissent," *post*, at 404 thereby showing disrespect not only to a coordinate branch of government, see *post*, at 415 ("[J]udges who are devoted to

the original intention of the framers of the Constitution ... ignore the original intentions of selected representatives in Congress."); *post*, at 406 ("There is not even a pretense of deference to Congress anywhere in their opinion."), but also to our own branch of government, see *post*, at 415 ("Today my colleagues thwart not only the intentions of Congress and the executive, but also the intentions of the Supreme Court."); *post*, at 404 ("[A]s appellate judges, our duty is to follow Supreme Court precedents, not to anticipate them."), and, for good measure, to the lawyers for one of the parties, in their efforts before and at oral argument, see *post*, at 412 ("[M]y colleagues have belittled their efforts at every turn.... [T]he questioning judge repeatedly cut off the lawyer's attempt to explain the government's reasoning."). We welcome vigorous debate, of course, but with all due respect, we think our colleague's overheated approach discouraging: not so much an invitation to invigorating debate as a bid to provoke a shouting match. One hopeful note, however: if taking seriously the responsibility of judicial review is a vice, it is a vice that fortunately is shared, at least at times, across the jurisprudential spectrum. See, *e.g., Action for Children's Television v. FCC*, 932 F.2d 1504, 1509–10 (D.C.Cir.1991) ("[J]ust as the FCC may not ignore the dictates of the legislative branch, neither may the judiciary ignore its independent duty to check the constitutional excesses of Congress.").

1984 with a bachelor of science degree in radio, television, and film studies. After leaving full-time studies at the university in 1977, Lamprecht started working in broadcasting. He began his career as an announcer at a radio station in Towson, Maryland. After moving up to program director, Lamprecht soon became operations manager, then station manager, and eventually general manager and vice president. Lamprecht later became general manager and part owner of an AM station in Farmville, North Carolina. He recently sold the Farmville station; if awarded the construction permit for the station in Middletown, Lamprecht plans to move there immediately with his family.

Barbara Driscoll Marmet, who lived part of the time in Frederick County, Maryland, part of the time in Bethesda, Maryland, and part of the time on Amelia Island, Florida, was fifty-eight when she applied for the construction permit. In Frederick County, Marmet attended the Frederick County Symphony and workshops held by Community Commons, an organization of people who, in Marmet's words, are "worried about the population increase that was coming both into the county and into the city." She received a plaque from the Frederick County Landmarks Foundation for restoring her house there. In Washington, Marmet served on a parents' committee at the Saint Albans School for boys, as a sustaining member of the Washington Junior League, as a member of the Chevy Chase Country Club, and as fiscal officer of her garden club. Currently part-owner of Ogden & Marmet, which manages several of the real-estate properties that she controls, Marmet worked part-time from 1970–1975 as a bookkeeper for Thomas Jefferson, Inc., another Washington real-estate firm of which she was once part-owner. From 1967–1970 Marmet worked part-time as a bookkeeper for her husband, Robert A. Marmet, a communications lawyer now in partnership in Washington with their son-in-law, Harold K. McCombs, Jr., who has represented Barbara Marmet in this proceeding. Although Marmet had never worked in radio or television, she had twice before owned pieces of broadcast properties. In 1969, she bought an interest in Viking Television, one of her husband's media clients, which was granted a permit (after Marmet sold her interest) to build a UHF television station in Minneapolis. In the mid–1970s, Marmet's husband gave her as a gift his ownership interest in Montgomery Communications, Inc., a company that had applied for a permit to build an AM station in Gaithersburg, Maryland. Marmet's relatives have also been involved in broadcasting. Her husband applied for a permit to build an FM station in Stamford, Connecticut, and her son-in-law applied at the same time for a permit to build an AM station there. Marmet's son-in-law more recently applied to build an AM station in Claremont, Virginia.

Dragon Communications, Inc. was owned by Thomas Buffington of Washington, D.C.; Gary Hess of Tarpon Springs, Florida; George Christopher, Jr. of Bethesda, Maryland; and Christine DeWitt of Silver Spring, Maryland, as joint tenant with her son, H.M. Lee DeWitt. Lee DeWitt, who came up with the idea for Dragon, recruited the others, including his mother and Buffington, and remains the company's moving force. He paid for his mother's ownership interest in the firm. Christine DeWitt had worked as a secretary for Robert Thompson, Dragon's lawyer, who was then at the law firm of Steptoe & Johnson. Hess lived and worked in Florida and owned quarter interests in three radio stations there. Buffington owns Thomas Buffington & Associates, an advertising and media consulting firm in Washington. He paid nothing for his interest in Dragon.

Port Royal Broadcasting, Inc. was owned by Richard Raymond Leverrier of Bethesda, Maryland; Mary Ellen Ferrel of Chevy Chase, Maryland; and Nancy Spruill Southmayd of Rockville, Maryland. Leverrier had previously worked at a television station, and his wife had filed an application competing with Dragon for a radio station in Ocean View, Delaware. Leverrier's wife (represented by Southmayd's husband) later was granted a construction permit for an FM station in Crisfield, Maryland. Leverrier's wife also applied to build an FM

station in Strasburg, Virginia, and the Leverriers applied together for permits to build FM stations in Long Beach, Washington, and Albany, Minnesota. Ferrel, who had once worked as an office assistant for a Washington architect, replaced her husband, at the time Leverrier's boss, as part owner of Port Royal shortly before applications were due. Southmayd, once a secretary and later a real-estate agent, had also done some bookkeeping work for her husband, a communications lawyer who represented Port Royal in this proceeding. Like the Marmets and the Leverriers, the Southmayds are not unfamiliar with broadcast properties. Jeffrey Southmayd applied in his own right to build an FM station in New Market, Virginia, and Nancy Southmayd, represented by her husband, applied for permits to build an AM station in Virginia City, Nevada, and an FM station in Snowmass, Colorado.

When discovery ended, the case came before an administrative law judge for resolution. *Jerome Thomas Lamprecht*, 99 F.C.C.2d 1229 (A.L.J.1984). The ALJ began by considering which of the applicants would further the diffusion of control over the means of mass communications. Lamprecht owned fewer than 1% (between $450 and $600 worth) of the shares in the company that owned the station where he worked, an amount considered irrelevant under Commission precedent. Marmet testified that she herself owned no significant interests in other media, aside from fewer than 1% of the shares of Cowles Communications (one of her husband's clients). After noting that Marmet's husband and son-in-law are both communications lawyers, the ALJ found, based at least in part on Marmet's demeanor, that Marmet would spend her own money on the station and that she had no implicit understanding with her husband or son-in-law that would dilute her ownership. The ALJ also found that neither Port Royal nor its stockholders owned any parts of other media properties at that time. The ALJ then examined the media holdings of Hess and Buffington and gave Dragon "a healthy comparative demerit."

Turning to the second of the Commission's goals, service to the public, the ALJ reviewed the applicants' proposals for integrating ownership and management. He gave Lamprecht and Marmet credit for 100% quantitative integration. He also gave Port Royal full credit, though he viewed skeptically Southmayd's promise to commute from Rockville to Middletown and work forty or more hours a week for a mere 4% ownership interest in the station. Although Dragon claimed that it was entitled to 88% quantitative-integration credit, the ALJ awarded it only 76%, since Dragon had asked for 76% credit in its earlier submission, and since in any event there was no proof in the record that Christopher or either of the DeWitts would actually work if awarded the permit. Because Dragon was at so grave a comparative disadvantage, the ALJ excluded it from further consideration.

Turning to the qualitative factors, the ALJ enhanced Marmet's score based on her having patronized the arts in Frederick County, her owning a home in Frederick County, and her sex. The ALJ enhanced Lamprecht's score because of Lamprecht's education in broadcasting and his prior broadcasting experience. The ALJ denied Port Royal any enhancement for local residence or civic participation, since none of Port Royal's principals lived or planned to live in or near Middletown, but he gave Port Royal a 52% enhancement because Ferrel and Southmayd are women. Finally, the ALJ gave Marmet and Port Royal credit for proposing auxiliary power in case of power failure. He concluded by awarding the permit to Marmet. Lamprecht finished second and Port Royal third.

Lamprecht, Dragon, and Port Royal appealed, focusing mainly on the ALJ's decision to give Marmet enhancement credit for local residence and civic participation. The Review Board affirmed. *Jerome Thomas Lamprecht*, 99 F.C.C.2d 1229 (Rev.Bd.1984). The Board first held that Dragon should have been given only a slight diversification demerit, for Hess's interest in one station in Florida but not for Buffington's consulting company. It then held that because Dragon had not sub-

mitted its second integration proposal on time, the ALJ had properly awarded Dragon only 76% quantitative-integration credit and had appropriately eliminated Dragon from further consideration. The Board endorsed the ALJ's decisions to award Marmet 100% integration credit and to enhance her score for local residence, agreeing that Marmet had at least dual residence and that she had shown a sufficient, if less than consuming, interest in the affairs of Frederick County. The Board endorsed the ALJ's decision to award Marmet credit for being a woman, and it agreed that Port Royal was entitled to less credit for having only 52% of its stock owned by women. The Board concluded by affirming the award of the permit to Marmet and holding that Port Royal should have finished second and Lamprecht third.

Port Royal decided to bow out. Lamprecht and Dragon petitioned for review of the Board's order, and the Commission denied the requests. *Jerome Thomas Lamprecht*, 3 F.C.C. Rcd. 2527 (1988). Lamprecht then appealed to this court, and Dragon and Marmet intervened.

## II

In his appeal, Lamprecht argues that the Commission's sex-preference policy violates both the Communications Act and the equal-protection component of the Fifth Amendment. He also argues that the congressional rider that restrains the Commission from rethinking the wisdom of its policy violates the constitutional doctrine of separation of powers. The Commission vigorously defends its policy, and Marmet has joined in the Commission's defense. Dragon, which filed its brief in this court the day before oral argument—twenty-nine days after it was due—contends that the ALJ, the Review Board, and the Commission mistakenly held Dragon to the original statement concerning its integration proposal, rather than accepting the statement that Dragon had filed after the deadline for submissions had passed. Dragon also argues that *Metro Broadcasting, Inc. v. FCC*, 497 U.S. 547, 110 S.Ct. 2997, 111 L.Ed.2d 445 (1990), obliges the Commission

in comparative-licensing proceedings automatically to prefer minorities to women.

Before we address the merits of Lamprecht's arguments, we explain briefly why we do not consider Dragon's. Dragon, like Lamprecht, was denied the permit that went to Marmet. Lamprecht exercised his statutory right to appeal. See 47 U.S.C. § 402(b)(1). Dragon, in contrast, decided for reasons not revealed to intervene in Lamprecht's case rather than appeal on its own. See *id.* § 402(e). Notwithstanding this unexplained (and unapologetic) lapse, in its brief in this court Dragon has raised arguments distinct from Lamprecht's statutory and constitutional challenges to the Commission's sex-preference policy. Except in extraordinary cases, however, see *Synovus Fin. Corp. v. Board of Governors*, 952 F.2d 426, 431–34 (D.C.Cir.1991), intervenors "may only join issue on a matter that has been brought before the court by another party," *Illinois Bell Tel. v. FCC*, 911 F.2d 776, 786 (D.C.Cir.1990). They cannot expand the proceedings. See *id.* (noting that "[o]therwise, the time limitations for filing a petition for review and a brief on the merits could easily be circumvented"); cf. *Vinson v. Washington Gas Light Co.*, 321 U.S. 489, 498, 64 S.Ct. 731, 735, 88 L.Ed. 883 (1944) ("[A]n intervenor is admitted to the proceedings as it stands, and in respect of the pending issues, but is not permitted to enlarge those issues or compel an alteration of the nature of the proceeding."). It would be grossly imprudent for us to address Dragon's separate contentions, statutory, but especially constitutional, when Dragon, despite having had every incentive to raise its arguments in the proper fashion, not only failed to do so, but fails now to proffer an excuse. We therefore pass over Dragon's contentions and proceed directly to Lamprecht's.

## A

When a federal court is asked to answer a constitutional question, basic tenets of judicial restraint and separation of powers call upon it first to consider alternative grounds for resolution. See, *e.g., Ash-*

*wander v. TVA*, 297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) (Brandeis, J., concurring). We therefore begin our discussion by determining whether the Commission has exceeded its statutory authority.

The Communications Act authorizes the Commission to grant construction permits for radio stations if "public convenience, interest, or necessity will be served thereby." 47 U.S.C. §§ 307(a), 309(a). Relying on *TV 9* and *West Michigan Broadcasting,* the Commission argues that its policy constitutes "a vital part of the FCC's public interest mandate," and is therefore consistent with the statute. Relying on *Steele,* Lamprecht argues that the policy violates the Communications Act if it violates the Constitution, since a Commission policy that is unconstitutional would inherently conflict with the public interest.

■ We have no occasion to decide whether the Communications Act bars the Commission from preferring women in comparative licensing. In the years since *Steele,* Congress by law has required a preference for women. See Pub.L. No. 101–515, 104 Stat. 2101, 2136–2137 (1990); Pub.L. No. 101–162, 103 Stat. 988, 1020–1021 (1989); Pub.L. No. 100–459, 102 Stat. 2186, 2216–2217 (1988); Pub.L. No. 100–202, 101 Stat. 1329, 1329–1331 (1987). That the laws at issue are appropriations riders does not change their status as the law. See, *e.g., Action for Children's Television v. FCC,* 932 F.2d 1504, 1507–10 (D.C.Cir. 1991). The Commission, in short, has not exceeded its authority—it has bowed to the will of Congress. Because we cannot decide this case on alternative grounds, we turn to the Constitution.

### B

In *Metro Broadcasting, Inc. v. FCC,* 497 U.S. 547, 110 S.Ct. 2997, 111 L.Ed.2d 445 (1990), the Supreme Court considered equal-protection challenges to two of the programs through which the Commission favors certain minorities. Together with the Supreme Court's cases involving classifications by sex, *Metro Broadcasting* compels us to strike down the program through which the Commission favors women. We do not reach Lamprecht's argument that Congress's appropriations rider violates the separation of powers.

### (1)

*Metro Broadcasting* concerned two programs through which the Commission chooses the owner of a broadcast station based in part on an applicant's race, ethnicity, or surname. In sustaining the programs against equal-protection attack, the Supreme Court applied an intermediate standard of scrutiny, holding that "benign race-conscious measures mandated by Congress ... are constitutionally permissible to the extent that they serve important governmental objectives within the power of Congress and are substantially related to achievement of those objectives." 110 S.Ct., at 3008–09 (footnote omitted). The Court thus considered first the stated aim of the government's programs—"enhancing broadcast diversity"—and held that this interest qualifies as a sufficiently "important" government goal. *Id.,* at 3010.

The Court then examined the Commission's programs to determine whether they were "substantially related" to achieving diversity of viewpoints. In its inquiry, the Court relied heavily on both the expertise of the Commission, see, *e.g., id.,* at 3011, and the factfinding of Congress. For proof of congressional factfinding, the Court focused closely on the debate over the Commission's statutorily authorized lottery scheme, which, in order "[t]o further diversify the ownership of the media of mass communications," grants "an additional significant preference" to "Blacks, Hispanics, American Indians, Alaska Natives, Asians and Pacific Islanders," 47 U.S.C. § 309(i)(3)(A), (i)(3)(C)(ii) (though not to women, see *Amendment of the Commission's Rules,* 102 F.C.C.2d 1401 (1985)). See 110 S.Ct., at 3012–16 & nn. 17–25. The Court found especially significant a report prepared by the Congressional Research Service entitled *Minority Broadcast Station Ownership and Broadcast Programming: Is there a Nexus?* (June 29, 1988) [hereinafter *Minority Programming* ].

The Court found a "host of empirical evidence" supporting the judgment that there is, in fact, a link between the ownership of stations by members of minority groups and the stations' programming practices. *Id.;* see *id.,* at 3017 nn. 31–33 (citing eight studies). Examining *Minority Programming,* for example, the Court noted that "[w]hile only 20 percent of stations with no Afro–American ownership responded that they attempted to direct programming at Afro–American audiences, 65 percent of stations with Afro–American ownership reported that they did so." *Id.,* at 3017 n. 31 (citing *Minority Programming* at 13). The Court explained that "[e]vidence suggests that an owner's minority status influences the selection of topics for news coverage and the presentation of editorial viewpoint." *Id.,* at 3017. Other evidence suggested that "Afro–American-owned, Afro–American–oriented radio stations have more · diverse playlists than white-owned, Afro–American–oriented stations." *Id.,* at 3017 n. 31. In light of all this evidence, the Court held,. Congress's "predictive judgment"—that "there may be important differences between the broadcasting practices of minority owners and their non-minority counterparts"—was sufficiently well-grounded in fact so as not to be a constitutionally "impermissible stereotype." See *id.,* at 3016–17.

### (2)

*Metro Broadcasting,* together with the Supreme Court's sex-discrimination cases, has ended debate on several matters. The first is our standard of scrutiny. The *Metro Broadcasting* Court held that "benign race-conscious measures mandated by Congress" do not violate the Fifth Amendment if "they serve important governmental objectives within the power of Congress and are substantially related to achievement of those objectives." 110 S.Ct., at 3008–09 (footnote omitted). The Supreme Court previously has used the same standard with respect to all sex-based classifications, whether enacted by Congress or by a state legislature. See, *e.g., Mississippi Univ. for Women v. Hogan,* 458 U.S. 718, 724, 102 S.Ct. 3331, 3336, 73 L.Ed.2d 1090 (1982)

("[T]he party seeking to uphold a statute that classifies individuals on the basis of their gender must carry the burden of showing an 'exceedingly persuasive justification' for the classification. The burden is met only by showing at least that the classification serves 'important governmental objectives and that the discriminatory means employed' are 'substantially related to achievement of those objectives.' " (citations omitted)) (reviewing a state statute); *Califano v. Westcott,* 443 U.S. 76, 85, 99 S.Ct. 2655, 2661, 61 L.Ed.2d 382 (1979) (reviewing a congressional statute under the same standard). We see no reason after *Metro Broadcasting* to examine sex-conscious measures mandated by Congress any more or less strictly than before, and no one seriously contends that we should. *Metro Broadcasting* also establishes that the promotion of diversity of viewpoints in general qualifies as an "important" objective within the government's power. The sole question remaining, therefore, is whether the government's methods are "substantially related" to the goal that it hopes to achieve.

█ *Metro Broadcasting* confirms that although we are "to give 'great weight to the decisions of Congress and to the experience of the Commission,' " 110 S.Ct., at 3011 (citation omitted), we are still obliged in the end to *review* the government's policy—both the judgment of law that the policy is constitutional and the findings of fact that underlie it. The Court explained: "[W]e do not ' "defer" to the judgment of the Congress and the Commission on a constitutional question,' and would not 'hesitate to invoke the Constitution should we determine that the Commission has not fulfilled its task with appropriate sensitivity' to equal protection principles." *Id.,* at 3011 (quoting *Columbia Broadcasting Sys. v. Democratic Nat'l Comm.,* 412 U.S. 94, 103, 93 S.Ct. 2080, 2087, 36 L.Ed.2d 772 (1973)); cf. *Action ·for Children's Television,* 932 F.2d, at 1509 (Mikva, C.J.) ("While 'we do not ignore' Congress' apparent belief that a total ban on broadcast indecency is constitutional, it is ultimately the judiciary's task ... to decide whether

Congress has violated the Constitution." (citation omitted)). In Justice Brandeis's formulation, "where a statute is valid only in case certain conditions exist, the enactment of the statute cannot alone establish the facts which are essential to its validity." *Whitney v. California,* 274 U.S. 357, 374, 47 S.Ct. 641, 648, 71 L.Ed. 1095 (1927) (concurring opinion).[2] We examine, then, the relationship between achieving diversity on the airwaves and the Commission's policy of preferring women owners, and in doing so we bear in mind Justice O'Connor's warning for the Court in *Mississippi University for Women:* "Although the test for determining the validity of a gender-based classification is straightforward, it must be applied free of fixed notions concerning the roles and abilities of males and females." 458 U.S., at 724–25, 102 S.Ct. at 3336.

In applying that test, the Supreme Court has repeatedly denounced "unsupported generalizations about the relative interests and perspectives of men and women," *Roberts v. United States Jaycees,* 468 U.S. 609, 628, 104 S.Ct. 3244, 3255, 82 L.Ed.2d 462 (1984), regardless of which sex the generalizations purport to favor. See, *e.g., Mississippi Univ. for Women,* 458 U.S., at 723–31, 102 S.Ct. at 3335–40 (striking down a women-only admissions policy at a state nursing school; condemning the stereotype that nursing is a woman's profession); *Caban v. Mohammed,* 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979) (striking down a statute that permitted mothers, but not fathers, to prevent the adoption of their children born out of wedlock; condemning the stereotype that a biological mother always bears a more intimate relationship with a child than does a father); *Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) (striking down a statute that permitted women to buy low-alcohol beer at a younger age than men; condemning the stereotype that women mature earlier than men and are more responsible at an earlier age); *Weinberger v. Wiesenfeld,* 420 U.S. 636, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975) (striking down a congressional statute that allowed widows, but not widowers, to collect Social Security benefits without proving dependency; condemning the stereotype that men rather than women are the primary supporters of spouse and family). As the Court has recognized time and again, "[D]iscrimination based on archaic and overbroad assumptions about the relative needs and capacities of the sexes forces individuals to labor under stereotypical notions that often bear no relationship to their actual abilities." *Jaycees,* 468 U.S., at 625, 104 S.Ct. at 3253; see also *Orr v. Orr,* 440 U.S. 268, 283, 99 S.Ct. 1102, 1114, 59 L.Ed.2d 306 (1978) ("Legislative classifications which distribute benefits and burdens on the basis of gender carry the inherent risk of reinforcing sexual stereotypes about the 'proper place' of women and their need for special protection."); *Frontiero v. Richardson,* 411 U.S. 677, 686–87, 93 S.Ct. 1764, 1770, 36 L.Ed.2d 583 (1973) (plurality opinion) ("[S]tatutory distinctions between the sexes often have the effect of invidiously relegating the entire class of females to inferior legal status without regard to the actual capabilities of its individual members.").

2. Our dissenting colleague reads *Metro Broadcasting* for the rule that "although courts should not defer to Congress on constitutional questions, we *should* defer ... to Congress on empirical questions." *Post,* at 406. Of course, the point about which we disagree with our colleague and with Congress—whether sex-based preferences will advance "substantially" the goal of increased programming diversity for intermediate scrutiny purposes—is a mixed question of law and fact, neither purely constitutional nor purely empirical. We nonetheless agree with our colleague insofar as he suggests that we must review Congress's judgment deferentially, without reweighing the evidence de novo. At times, however, our colleague hints at the far different hypothesis that deference means not just limited factual review, but none at all. See, *e.g., post,* at 406. We know of no support—and our colleague cites none—for the proposition that if the constitutionality of a statute depends in part on the existence of certain facts, a court may not review a legislature's judgment that the facts exist. If a legislature could make a statute constitutional simply by "finding" that black is white or freedom, slavery, judicial review would be an elaborate farce. At least since *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803), that has not been the law.

Applying its standard of intermediate scrutiny, the Court has therefore required not only that sex-based generalizations be "supported," but that the support be strong enough to advance "substantially" the legitimating governmental interest. *Craig v. Boren,* for example, concerned an Oklahoma statute that allowed women, but not men, to buy low-alcohol beer at age 18. The state showed (among other evidence) that 2% of 18– to 20–year old men, but only .18% of women that age, were arrested for driving under the influence. Rejecting the correlation between maleness and drunk driving as "unduly tenuous [a] 'fit,'" 429 U.S., at 202, 97 S.Ct. at 459, the Court also noted that "[w]hile [the] disparity [between arrest rates for men and women] is not trivial in the statistical sense, it hardly can form the basis for employment of a gender line as a classifying device," *id.,* at 201, 97 S.Ct. at 459. Justice Brennan concluded: "In sum, the principles embodied in the Equal Protection Clause are not to be rendered inapplicable by statistically measured but loose-fitting generalities concerning the drinking tendencies of aggregate groups." *Id.,* at 208–09, 97 S.Ct. at 463.

Similarly, in *Weinberger v. Wiesenfeld,* the Court reviewed the constitutionality of an act of Congress that gave to widows Social Security benefits not available to widowers. Congress had proceeded on the presumption that women are less likely than men to be the family breadwinners, and the Court acknowledged that Congress's presumption was "not entirely without empirical support." Nevertheless, as Justice Brennan explained for the Court,

"such a gender-based generalization cannot suffice to justify the denigration of the efforts of women who do work and whose earnings contribute significantly to their families' support." 420 U.S., at 645, 95 S.Ct. at 1232; see also *Califano v. Westcott,* 443 U.S., at 88, 99 S.Ct. at 2662 (striking down a part of the Aid to Families with Dependent Children program because there was "no evidence, in the legislative history or elsewhere," supporting Congress's assumption that fathers are likelier than mothers to desert their families, and thus concluding that "it does not appear that the [sex-based] classification is substantially related to the achievement of [Congress's] goal"); *Califano v. Goldfarb,* 430 U.S. 199, 97 S.Ct. 1021, 51 L.Ed.2d 270 (1977) (plurality opinion) (relying on *Wiesenfeld* to strike down another section of the Social Security Act, and stating that Congress had "not verified" the assumption that men are less likely to depend on women for support than vice versa); cf. *Arizona Governing Comm. v. Norris,* 463 U.S. 1073, 103 S.Ct. 3492, 77 L.Ed.2d 1236 (1982) (holding that title VII of the Civil Rights Act of 1964 prohibits differences in the amount of pension benefits paid to men and women, even though sex-based actuarial tables show that women in the aggregate live longer than men).

*Metro Broadcasting* thus reinforces the lessons of cases such as *Craig* and *Wiesenfeld:* Any "predictive judgments" concerning group behavior and the differences in behavior among different groups must at the very least be sustained by meaningful evidence.[3] In concluding in

---

3. Our dissenting colleague asserts that a sex-based classification might survive intermediate scrutiny even if it rests upon unsupported generalizations about men or women as a group. See *post,* at 406–408. He notes correctly that "the purpose of intermediate scrutiny" is to ensure that sex-based classifications are based on "reasoned analysis" rather than "archaic stereotypes," *post,* at 408, possibilities that he appears rightly to regard as mutually exclusive. But an "analysis" that rests upon unsupported factual premises cannot possibly be "reasoned," and an untrue and widely-held generalization about men or women is by definition a "stereotype." See, *e.g.,* U.S. Civil Rights Comm'n, *Characters in Textbooks* 5 (1980) (explaining that a member of a group is "stereotyped" when she is "por-

trayed in a stylized manner that conforms to widely accepted, but often untrue, ideas of what members of the group are like"). More to the point, unless a generalization about men or women asserted in defense of a sex-based classification is grounded in some degree of fact, the classification cannot possibly advance *any* legitimate state interest, much less an important one. Our dissenting colleague, however, insists that a relevant generalization is presumed true (even if unsupported) unless proved otherwise. See *post,* at 408, 414. On this point, our colleague is mistaken—for it is a "firmly established principle[ ]" that "the burden of showing an 'exceedingly persuasive justification'" falls on "the party seeking to uphold a statute that

*Metro Broadcasting* that the government's race-based predictions were "a product of 'analysis' rather than a 'stereotyped reaction' based on '[h]abit,' " the Supreme

classifies individuals on the basis of their gender." *Mississippi Univ. for Women*, 458 U.S., at 723–24, 102 S.Ct. at 3335–36 (citation omitted); see also *Heckler v. Mathews*, 465 U.S. 728, 744–45, 104 S.Ct. 1387, 1398, 79 L.Ed.2d 646 (1984) (imposing the same burden with respect to federal statutes).

In our view, *Craig v. Boren* establishes beyond doubt that a sex-based classification cannot survive unless the "sex-centered generalization" asserted in the law's defense "actually comport[s] with fact." 429 U.S., at 199, 97 S.Ct. at 458. *Craig* struck down a sex-based differential in Oklahoma's drinking age precisely because of the "ultimate unpersuasiveness of th[e] evidentiary record" compiled by the State in order to prove that young men were likelier to drive drunk than were young women. *Id.*, at 201, 97 S.Ct. at 459; see also *id.*, at 204, 97 S.Ct. at 460 ("[T]he showing offered by [the State] does not satisfy us that sex represents a legitimate, accurate proxy for the regulation of drinking and driving."). Because so few men in the aggregate drive drunk, as the statistics themselves indicated, the Court concluded that "the relationship between gender and traffic safety" was "far too tenuous" to meet the intermediate scrutiny test. See *id.*, at 204, 97 S.Ct. at 460. Our dissenting colleague contends that the Court "struck down the law only after pointing out that the different drinking ages were based on 'social stereotypes.' " *Post*, at 408 (quoting 429 U.S., at 202 n. 14, 97 S.Ct. at 459 n. 14). But the point of the Court's observation was that the stereotypes (themselves unsupported generalizations) were likely "to distort the accuracy of the [  ] comparative statistics" asserted to justify them, because " 'reckless' young men who drink and drive are transformed into arrest statistics, whereas their female counterparts are chivalrously escorted home." 429 U.S., at 202 n. 14, 97 S.Ct. at 459 n. 14. This and other "methodological problems" with the statistics further supported the Court's judgment that the necessary link was "far too tenuous" empirically. See *id.*, at 202–04, 97 S.Ct. at 459–60. Thus, the Court's observation that "proving broad sociological propositions by statistics is a dubious business," *id.*, at 204, 97 S.Ct. at 460, underscores only that some statistically-observed correlations are insufficient to validate a sex-based classification—and not, as our dissenting colleague suggests, see *post*, at 408, that a correlation "between gender and the characteristic or trait that gender purport[s] to represent," 429 U.S., at 199, 97 S.Ct. at 458, is unnecessary. *Weinberger v. Wiesenfeld* is to the same effect as *Craig v. Boren*. The Court struck down the statute at issue because it rested on an " 'archaic and overbroad' generalization"—that is, on assumptions that "in view of the large percentage of married women working (41.5% in 1971)" and "other current statistics" bore "little relationship to present reality." 420 U.S., at 642 & n. 11, 95 S.Ct. at 1231 & n. 11; see also *Califano v. Westcott*, 443 U.S., at 88–89, 99 S.Ct. at 2663 (concluding that because no " 'statistical evidence' " supported Congress's sex-based distinction, the classification must rest on some " 'baggage of sexual stereotypes' " and therefore "is not substantially related to the attainment of any important and valid statutory goals").

Our dissenting colleague cites no case in which a sex-based classification was upheld despite the absence of a demonstrable and relevant difference between men and women. Neither *Michael M. v. Superior Court*, 450 U.S. 464, 101 S.Ct. 1200, 67 L.Ed.2d 437 (1981) (plurality opinion), nor *Rostker v. Goldberg*, 453 U.S. 57, 101 S.Ct. 2646, 69 L.Ed.2d 478 (1981), see *post*, at 407–408, establishes this possibility. *Michael M.* upheld a statute punishing only men for having sexual relations with minors. The statute was designed to prevent teenage pregnancy, and it reflected the obvious biological fact that only women can become pregnant. Addressing the question whether that relevant difference was *sufficient* to justify the classification, a plurality rested on the ground that a sex-neutral statute might be less effective because "a female is surely less likely to report violations of the statute if she herself would be subject to criminal prosecution." 450 U.S., at 473–74, 101 S.Ct. at 1207 (plurality opinion). The plurality's subsequent characterization of that proposition as merely a plausible one of "differing speculations," see *id.*, at 474 n. 10, 101 S.Ct. at 1207 n. 10, might have suggested that sex-based classifications are presumed supported until proven otherwise, but the Court's later pronouncements squarely reject this reading. See, *e.g.*, *Mathews*, 465 U.S., at 744, 104 S.Ct. at 1398 (" '[T]he party seeking to uphold a statute that classifies individuals on the basis of their gender must carry the burden of showing … that the "discriminatory means employed" are "substantially related to the achievement of [important governmental] objectives." ' " (quoting *Mississippi Univ. for Women*, 458 U.S., at 724, 102 S.Ct. at 3336 (internal quotations omitted))). *Rostker* upheld a statute requiring only men to register for the draft. Another statute, unchallenged in *Rostker*, prohibited women from combat. Considering whether that relevant difference was *sufficient* to justify another sex-based classification with respect to draft registration, the Court rested upon Congress's factual finding that "any future draft … would be characterized by a need for combat troops." 453 U.S., at 76, 101 S.Ct. at 2657. After itself reviewing the evidence supporting that finding, the Court criticized the district court for not conducting an "appropriately deferential examination" of the evidence, *id.*, at 83, 101 S.Ct. at 2661—a limited review (as is always the case when courts review legislative factfinding), but a review nonetheless. In short, neither *Michael M.* nor *Rostker* insulates Congress's empirical judgments from scrutiny, and neither even remotely supports the proposition for which they are cited—that the constitutionality of a sex-based distinction *does not depend* upon the degree of correlation between sex and the attribute for which sex is used as a proxy.

Court examined a "host" of studies supporting the government's judgment that diversity of viewpoints increases substantially when station owners are selected in part on the basis of race or ethnicity. See 110 S.Ct., at 3018 (citation omitted and internal quotation marks amended). We now examine, in light of these principles, the evidence supporting the government's judgment that diversity increases substantially when owners are selected in part on the basis of sex.

(3)

■ Implicit in the government's judgment are at least three assumptions: first, that there exists such a thing as "women's programming" (or "Alaskan programming," say, or "suburban teenage easy listener programming"); second, that these distinct types of programming are underrepresented on the airwaves; and third, that women who own radio or television stations are likelier than white men to broadcast these distinct types of programming. Lamprecht challenges each of these assumptions.

We decline to address Lamprecht's first argument. The Supreme Court assumed in

*Metro Broadcasting* that there are such things as "minority programming" of different kinds, and we assume the same with respect to "women's programming" and other distinct programming types. We also decline to address Lamprecht's second argument. Although the Commission might risk raising other constitutional questions if it tried to set out some "correct" mix of information or viewpoints, we follow the Supreme Court's lead and assume that all the types of programming that women might put on the air are underrepresented. We assess, then, the last of the assumptions implicit in the Commission's sex-conscious policy. But having considered the evidence offered to demonstrate a link between ownership by women and any type of underrepresented programming, we are left unconvinced.[4]

The Commission's brief cites nothing that might support its predictive judgment that women owners will broadcast women's or minority or any other underrepresented type of programming at any different rate than will men. Nor is there any proof in the administrative record, a point that the Commission's lawyer confirmed repeatedly at oral argument.[5] We consider then the

4. Our dissenting colleague tells us that we identify "women's or minority programming" as "programming specifically targeted at women or minorities," *post*, at 409. We do not. Neither "women's viewpoint" nor "women's programming" necessarily means viewpoints or programming targeted to women or of special interest to women or concerning subjects that some may suppose women are likely to put on the airwaves, and the same is true for "minority viewpoint" or "minority programming." Rather than presume to give content to these terms, cf. *post*, at 411 (calling "innocuous to the point of being obvious" the assumption that "some female programmers will choose to emphasize different subjects—breast cancer, say, or glass ceilings in the workplace"); *infra* note 8, we remain agnostic. We do assume, however, as did Congress, that these terms necessarily have *some* meaning—but whatever "women's programming" and "minority programming" are, there is no evidence showing that women owner/managers are substantially likelier to program them than are men.

5. This exchange was typical:
Judge Thomas: ... I am asking you, in the aggregate, what difference does it make, other

than [that] you have a male owner or a female owner?
Mr. Pash: I think that what difference it makes, ... is that there is a reasonable expectation—
Judge Thomas: Based on what?
Mr. Pash: —a reasonable expectation based on the fact that women are a significant group, the fact that they are significant in size, they are a significant group in the society.
Judge Thomas: I understand that. I understand that women are a significant group, and I understand that they are significant in size. But what difference does it make, if a woman owns a station or if women owned all the stations, other than that they owned all the stations? Does it make a difference in programming, does it make a difference in content of the points of view, does it make a difference in the editorials? What does it make a difference?
Mr. Pash: It makes a difference ... it makes a difference in viewpoint and perspective presented on the station, and the expectation is that—
Judge Thomas: Okay. Now, what is that based on?

only study, so far as we know,[6] either inside or outside the legislative record, that actually did examine the possibility: the Congressional Research Service report, *Minority Broadcast Station Ownership and Broadcast Programming: Is There a Nexus?*[7]

> Mr. Pash: That is based on the expectation that, because women and other groups—but in this case we are talking about women—have been historically subject to societal prejudices and particular societal attitudes that they—
> Judge Thomas: So, does that mean they will have a different point of view as a result of prejudice, or they don't own stations as a result of prejudice?
> Mr. Pash: No, that means that there is an expectation that, in the aggregate, they will have a different perspective on questions, not on every question, not in every case, but—
> Judge Thomas: Based on *what*, though? I mean how can you conclude that [women] will have a different perspective?
> Mr. Pash: Well, I guess this is going to sound circular, but you can conclude they will have a different perspective, because, historically, they have been subject to prejudice and different societal attitudes, and this has led to their playing a different role in society, they are being treated differently, subject to stereotypes and so forth....
> Judge Thomas: But how is this expectation any different from a stereotype, if it doesn't have any basis in fact?
> Mr. Pash: Well, I am not saying it does. I am saying it doesn't have any basis in fact. I am saying that this record doesn't provide factual evidence for it....
> ....
> Judge Thomas: Okay. Fine. But is there any evidence that there is a difference between the stations owned by women and owned by men?
> Mr. Pash: No, there is no evidence in the record.
> Chief Judge Mikva: You said that three times now....

Tr. of Oral Arg. at 33–36; see also *id.*, at 32, 38, 41–42, 44.

**6.** Our dissenting colleague terms us "less than sporting" for failing to "call[ ] for amicus briefs on the statistical question." *Post*, at 414. Any interested party could have filed an amicus brief had it chosen to, however, and we doubt that our colleague seriously means what he says—that a court generally should ask of its own accord for amicus briefing whenever (as is often the case) additional paper might prove helpful. To the extent that our colleague still disagrees with our decision not to accept the amicus brief of American Women in Radio and Television, Inc., we note for the record only that the organization submitted its brief out of time, but that neither the organization nor our colleague offered an explanation for why we should forgive the group for violating the rules of the court.

Whatever the study's methodological flaws,[8] it does answer its own question, at least with respect to women. The answer it gives is "no." Consider the following facts, which we summarize in text and show in tables in the appendix.

**7.** Although he maintains that "if my colleagues want more statistics, there are plenty to support Congress's position," *post* at 414, the anecdotes that our colleague relates do not sustain his argument. Our colleague relies upon an amicus brief filed in *Metro Broadcasting*, by American Women in Radio and Television, that he says shows that of the recipients of the 1986 "National Commendation Awards" for presenting women in a "positive and realistic light," women made up 58.5% of the producers, 84.2% of the writers, and 92.9% of the reporter/hosts. This is interesting, but irrelevant, for reasons that also apply to our colleague's admittedly "quick skim of the best-seller lists," *post*, at 415. Congress has given a preference to women who own and manage radio and television stations, not women who write or produce or report for them. Our dissenting colleague's statistics thus matter only insofar as they rest on certain stereotypes about how women behave. "Managers" are not necessarily "programmers"; as the Commission has made clear since it first set out its comparative-licensing scheme, an owner is entitled to integration credit if she serves as "program director" *or* as "station manager," "business manager," or "sales manager," among other jobs. *Policy Statement on Comparative Broadcast Hearings*, 1 F.C.C.2d, at 395. And even if we were to assume for the sake of argument that women owners are likelier than men to become programmers, rather than business managers, we would have to assume that women owner/programmers are likelier than men to hire women producers, women writers, and women reporters. Either or both of these may well be so, but since our colleague offers no evidence to support them, we think it appropriate to hesitate before giving too much credence to these assumptions about sex roles in the marketplace.

**8.** Unfortunately, *Minority Programming* does not define terms such as "women's programming" (or "minority programming," for that matter), but rather, relied on the reporting stations to characterize themselves. The study itself warns readers of this and other problems. See *Minority Programming* at 1–8; see also Spitzer, *Justifying Minority Preferences in Broadcasting*, 64 S.Cal.L.Rev. 293, 342–45, 345–46 (1991); *Winter Park*, 873 F.2d, at 358–61 (Williams, J., concurring in part and dissenting in part).

* Of stations owned primarily by women, slightly more than a third, or 35%, broadcast what the study calls "women's programming." Of stations owned entirely by "non-women," a slightly lower portion, or 28%, broadcast women's programming. For others given preferences in comparative licensing, the difference is dramatic. Of stations owned primarily by Blacks, 79% broadcast Black programming, while of stations owned entirely by people who are not Black, 20% broadcast Black programming; of stations owned primarily by Hispanics, nearly three-quarters, or 74%, broadcast Hispanic programming, while of stations owned entirely by people who are not Hispanic, 10% broadcast Hispanic programming; of stations owned primarily by Asians or Pacific Islanders, 25% broadcast Asian or Pacific Islander programming, while of stations owned entirely by people who are not Asians or Pacific Islanders, 3% broadcast Asian or Pacific Islander programming; of stations owned primarily by Indians or Alaskans, 46% broadcast Indian or Alaskan programming, while of stations owned entirely by people who are not Indian or Alaskan, 4% broadcast Indian or Alaskan programming. To put it another way: Stations owned primarily by Indians or Alaskans are more than eleven times as likely to broadcast Indian or Alaskan programming as are stations with no Indian or Alaskan owners. For Asians or Pacific Islanders, the comparable multiplier is more than eight; for Hispanics, more than seven; for Blacks, almost four. In contrast, stations owned primarily by women are just one and one quarter times as likely to broadcast women's programming as are stations owned entirely by men. See app. table 1, at 35.

* Stations in which women own anywhere from 1% to 50% of the equity are just as likely to broadcast women's programming as are stations owned principally or entirely by women. In contrast, stations in which Indians or Alaskans own from 1% to 50% are only half as likely to broadcast Indian or Alaskan programming as are stations owned principally by Indians or Alaskans. See app. table 2, at 36.

* In five large cities, New York, Los Angeles, Chicago, Dallas, and Atlanta, stations with any owners of Black, American Indian, Alaskan, Hispanic, Asian, or Pacific Islander heritage are likelier to broadcast women's programming than are stations with any owners who are women: Only one-third of stations with any women owners broadcast women's programming, while almost three-fifths of stations with Hispanic owners, half of stations with Asian, Pacific Islander, Indian, or Alaskan owners, and more than two-fifths of stations with Black owners, broadcast women's programming. In all cities combined, barely more than one-third of stations with women owners broadcast women's programming, while half of stations with Indian or Alaskan owners, and more than 40% of stations with Hispanic or Black owners, do so. For stations in which the relevant group holds between one and fifty percent ownership interests, women are less likely to broadcast women's programming than are Indians, Alaskans, Hispanics, Blacks, Asians, and Pacific Islanders. See app. table 3, at 37; app. table 4, at 37; app. table 5, at 38.

* Of the ten most-used programming formats, nine are as popular in almost precisely the same order for stations owned by "non-minorities" (again, that could include both women and men) as they are for stations owned by women. See app. table 10, at 40.

* Nor are stations owned by women much likelier to engage in *minority* programming than are stations owned by men, as *Minority Programming* reveals. Stations with women owners are barely, if at all, likelier to broadcast assorted types of minority programming than are stations owned by anyone else, and are in fact much less likely to broadcast minority programming than members of most of the relevant minority groups. Of stations owned in any part by women, just 5% broadcast Asian or Pacific Islander programming, for example, while of stations owned by "non-Asian/Pacific Islanders" (which may or may not include women) only 3% broadcast Asian or Pacific Islander programming. Stations with Hispanic owners, in contrast, are three times as likely to broadcast Asian or

Pacific Islander programming as are stations with any women owners, and stations with Black owners are more than twice as likely to broadcast Asian or Pacific Islander programming as are stations with any owners who are women. The data show similar results for Hispanic programming: stations with Hispanic owners are nearly five times as likely, and stations with Asian or Pacific Islander owners more than twice as likely, to broadcast Hispanic programming as are stations owned in any part by women. Of stations with women owners, only 5% broadcast Indian or Alaskan programming, barely a higher proportion than the 4% of stations owned entirely by "non-Indian/Alaskans" that do so. For Black programming the comparable percentages are 26% for stations with women owners and 20% for stations owned by non-Blacks. See app. table 6, at 38; app. table 7, at 39; app. table 8, at 39; app. table 9, at 40.

To summarize: The data in *Minority Programming* fail to establish any statistically meaningful link between ownership by women and programming of any particular kind. The study, in short, highlights the hazards associated with government endeavors like this one. As Justice Brennan has written for the Court, "[P]roving broad sociological propositions by statistics is a dubious business, and one that inevitably is in tension with the normative philosophy that underlies the Equal Protection Clause." *Craig v. Boren,* 429 U.S., at 204, 97 S.Ct. at 460.[9]

■ When the government treats people differently because of their sex, equal-protection principles at the very least require that there be a meaningful factual predicate supporting a link between the government's means and its ends. In this case, the government has failed to show that its sex-preference policy is substantially related to achieving diversity on the airwaves. We therefore hold that the policy violates the Constitution.

## III

■ We turn finally to the question of remedy. Lamprecht urges us to order the Commission to award him the permit for the Middletown station. It is well settled, however, that once we correct an agency's error of law, we must remand for the agency to exercise its discretion, assuming, of course, that the agency retains any discretion to exercise. See generally *FCC v. Pottsville Broadcasting Co.,* 309 U.S. 134, 141–46, 60 S.Ct. 437, 440–43, 84 L.Ed. 656 (1940). In deciding which of several applicants best served the public interest, the Commission did not assign precise numerical values for each of the factors that it considered. Cf. *Omaha TV 15, Inc.,* 4 F.C.C. Rcd. 730 (1989). The Commission's ultimate decision is thus not susceptible to mathematical adjustment by this court; hence, we cannot allow "the contingencies of judicial review and of litigation, rather than the public interest, [to] be decisive factors in determining which of several pending applications [should] be granted."

---

9. Our dissenting colleague declares that "judges have no basis, except their own policy preferences," for concluding that the degree of correlation shown here is not "enough," since the Fifth Amendment does not identify the "mystical" point at which a correlation satisfies the dictates of equal protection. *Post,* at 413. Our colleague is not the first to criticize the intermediate-scrutiny test for its indeterminacy. See *Craig v. Boren,* 429 U.S., at 221, 97 S.Ct. at 469 (Rehnquist, J., dissenting) ("[T]he phrases used are so diaphanous and elastic as to invite subjective judicial preferences or prejudices relating to particular types of legislation masquerading as judgments whether such legislation is directed at 'important' objectives or whether the relationship to those objectives is 'substantial.'"). While rational basis or strict scrutiny review would make for fewer close cases, however, we

have no authority for departing from the Supreme Court's decision to follow the middle course. Intermediate scrutiny, then, which *Metro Broadcasting* requires of us, calls for judgment—for drawing a line. The line we necessarily draw today, holding that the degree of correlation in this case is not enough, is different from the line drawn in *Metro Broadcasting* (that a much stronger degree of correlation was enough), the line drawn in *Craig* (that an arguably weaker degree of correlation was not enough), and the line proposed today by our colleague in dissent (that the degree of correlation in this case is enough). Despite what our colleague states, the line that we draw is neither more nor less principled than the line that he draws; our lines are merely grounded in different exercise of judgment.

*Pottsville Broadcasting*, 309 U.S., at 145–46, 60 S.Ct. at 443.

We have held on the record before us that the Commission's sex-preference policy violates the Fifth Amendment. On remand, therefore, the agency must determine who, in the absence of this unconstitutional policy, should receive the permit to build the station in Middletown.

IV

As our dissenting colleague has written, "[J]ust as the FCC may not ignore the dictates of the legislative branch, neither may the judiciary ignore its independent duty to check the constitutional excesses of Congress." *Action for Children's Television*, 932 F.2d, at 1509–10. Congress and the Commission have failed to meet the standards specified by the Supreme Court in its intermediate-scrutiny cases. We therefore vacate the decision under review and remand this case for further proceedings consistent with our opinion.

*It is so ordered.*

APPENDIX

Table 1

| Ownership Interests | | Percentage That Broadcast Relevant Programming | |
|---|---|---|---|
| Blacks | 51 to 100% | 79% | Black programming |
| | 0 | 20 | |
| Hispanics | 51 to 100% | 74% | Hispanic |
| | 0 | 10 | |
| Asians/Pacific Islanders | 51 to 100% | 25% | Asian/Pacific |
| | 0 | 3 | |
| Indians/ Alaskans | 51 to 100% | 46% | Indian/Alaskan |
| | 0 | 4 | |
| *Women* | *51 to 100%* | *35%* | *Women's* |
| | *0* | *28* | |

(Source: *Minority Programming* figure 5A, at 14; figure 6A, at 15; figure 7A, at 16; figure 8A, at 17; figure 9A, at 18.)

Table 2

| Ownership Interests | | Percentage That Broadcast Relevant Programming | |
|---|---|---|---|
| Blacks | 51 to 100% | 79% | Black programming |
| | 1 to 50% | 60 | |
| Hispanics | 51 to 100% | 74% | Hispanic |
| | 1 to 50% | 53 | |
| Asians/Pacific Islanders | 51 to 100% | 25% | Asian/Pacific |
| | 1 to 50% | 14 | |
| Indians/ Alaskans | 51 to 100% | 46% | Indian/Alaskan |
| | 1 to 50% | 23 | |
| *Women* | *51 to 100%* | *35%* | *Women's* |
| | *1 to 50%* | *35* | |

(Source: *Minority Programming* figure 5A, at 14; figure 6A, at 15; figure 7A, at 16; figure 8A, at 17; figure 9A, at 18.)

Table 3

*Five Large Cities*
(New York, Los Angeles, Chicago, Dallas, Atlanta)

| *Ownership Interests (1 to 100%)* | *Percentage That Broadcast Women's Programming* |
|---|---|
| 1. Hispanics | 59% |
| 2. Asians/Pacific Islanders | 50 |
| 3. Indians/Alaskans | 50 |
| 4. Blacks | 42 |
| 5. *Women* | *33* |
| 6. Non-minorities | 27 |

(Source: *Minority Programming* at 65.)

Table 4

*All Cities*

| *Ownership Interests (1 to 100%)* | *Percentage That Broadcast Women's Programming* |
|---|---|
| 1. Indians/Alaskans | 50% |
| 2. Hispanics | 42 |
| 3. Blacks | 42 |
| 4. *Women* | *35* |
| 5. Asians/Pacific Islanders | 30 |
| 6. Non-women (Men) | 28 |

(Source: *Minority Programming* figure 9A, at 18.)

Table 5

*All Cities*

| *Ownership Interests (1 to 50%)* | *Percentage That Broadcast Women's Programming* |
|---|---|
| 1. Indians/Alaskans | 50% |
| 2. Hispanics | 49 |
| 3. Blacks | 47 |
| 4. Asians/Pacific Islanders | 35 |
| 5. *Women* | *35* |
| 6. Non-women (Men) | 28 |

(Source: *Minority Programming* figure 9A, at 18.)

Table 6

*All Cities*

| Ownership Interests (1 to 100%) | Percentage That Broadcast Asian/Pacific Programming |
|---|---|
| 1. Asians/Pacific Islanders | 16% |
| 2. Hispanics | 15 |
| 3. Blacks | 11 |
| 4. Indians/Alaskans | 6 |
| 5. *Women* | *5* |
| 6. Non–Asians/Pacific Islanders | 3 |

(Source: *Minority Programming* figure 7A, at 16.)

Table 7

*All Cities*

| Ownership Interests (1 to 100%) | Percentage That Broadcast Hispanic Programming |
|---|---|
| 1. Hispanics | 59% |
| 2. Asians/Pacific Islanders | 28 |
| 3. Blacks | 22 |
| 4. *Women* | *13* |
| 5. Non–Hispanics | 10 |
| 6. Indians/Alaskans | 8 |

(Source: *Minority Programming figure 6A, at 15.*)

Table 8

*All Cities*

| Ownership Interests (1 to 100%) | Percentage That Broadcast Indian/ Alaskan Programming |
|---|---|
| 1. Indians/Alaskans | 32% |
| 2. Hispanics | 17 |
| 3. Blacks | 9 |
| 4. Asians/Pacific Islanders | 9 |
| 5. *Women* | *5* |
| 6. Non–Indians/Alaskans | 4 |

(Source: *Minority Programming* figure 8A, at 17.)

Table 9

*All Cities*

| *Ownership Interests (1 to 100%)* | *Percentage That Broadcast Black Programming* |
|---|---|
| 1. Blacks | 65% |
| 2. Hispanics | 35 |
| 3. Indians/Alaskans | 29 |
| 4. *Women* | *26* |
| 5. Asians/Pacific Islanders | 25 |
| 6. Non–Blacks | 20 |

(Source: *Minority Programming* figure 6A, at 15.)

Table 10

*Ten Most Used Formats (of 22)*

| *Non–Minorities* | *Women* |
|---|---|
| 1. Religious | 1. Religious |
| 2. Adult Contemporary | 2. Adult Contemporary |
| 3. Country & Western | 3. Country & Western |
| 4. Talk | 4. All News |
| 5. Agriculture & Farm | 5. Talk |
| 6. All News | 6. Agriculture & Farm |
| 7. Golden Oldies | 7. Golden Oldies |
| 8. Other | 8. Other |
| 9. Education | 9. Education |
| 10. Middle of the Road | 10. Jazz |

*Two Least Used Formats (of 22)*

| | |
|---|---|
| 1. Foreign Language | 1. Foreign Language |
| 2. American Indian | 2. American Indian |

(Source: *Minority Programming* table 3, at 38.)

---

BUCKLEY, Circuit Judge, concurring:

Our dissenting colleague's charges notwithstanding, the majority opinion is both faithful to the Supreme Court's holdings in *Metro Broadcasting, Inc. v. FCC* and respectful of Congress's factfinding and policymaking roles.

The question we are asked to decide is whether the gender preference mandated by Congress is *substantially* related to the achievement of greater variety in broadcasting. *See Metro*, 497 U.S. 547, 110 S.Ct. 2997, 3008–09, 111 L.Ed.2d 445 (1990). The Court noted, in *Metro*, that it "must pay close attention to ... the factfinding of Congress when establishing the nexus between minority ownership and programming diversity." *Id.* 110 S.Ct. at 3011. It concluded that that nexus had been "corroborated by a host of empirical evidence," citing in particular the Congressional Research Service analysis that is examined in detail in the majority opinion. *See id.* at 3017 & n. 31; maj. op. at 396–398.

As noted in the majority opinion, the CRS study reveals an impressive relationship between minority ownership and program diversity. For example, 79% of stations owned primarily by blacks will broadcast black programming as contrasted with only 20% of those owned by non-blacks. This is a ratio of four to one. In the case of Hispanics, the figures are 74% and 10%, for a multiple of more than seven to one; and in the case of Indians and Alaskans, the figures are 46% and 4%—more than a ten-fold increase. No one would question, least of all the majority, that these statistics demonstrate a striking relationship between minority ownership and programming.

By contrast, the differences in programming between stations owned primarily by women and those owned by men are modest: an increase of from 28% to 35% in the case of women's programming and, in the case of non-black owners, an increase of from 20% to 26% in black programming. These seven and six percentage point increases pale in comparison with the fifty-nine and sixty-four percentage point differentials to be found in the case of black- and Hispanic-owned stations.

The dissent asserts that this disparity is understandable because in the case of gender, the effect of ownership on broadcasting is more likely to be manifested in a diversity of viewpoints than in differences in programming. That may well be the case, but it has not been documented in the record before us. Further research may vindicate this intuition; but until the evidence is marshaled, it is hard to see how the preference accorded women in the FCC's licensing process can pass constitutional muster.

At base, the quarrel between the majority and the dissent revolves around how substantial the relationship must be between ownership and program diversity in order to justify a gender-based distinction that would otherwise offend the Constitution's equal protection principles. Our dissenting colleague disagrees with our conclusion that the indicated relationship between the gender of station owners and diversity in programming is not substantial enough to pass constitutional scrutiny. Fair enough. But lines must be drawn; and, with great respect, I do not believe that a disagreement over where it should be drawn warrants the charge that the majority is engaged in judicial activism.

This litigation deals with a sensitive subject, and it is not surprising that it should have aroused some passions. Unfortunately, this case has also proven the occasion for a most serious breach of trust. I refer to an article that appeared on September 30, 1991, in *The Legal Times*, which purported to report in some detail on the contents of preliminary drafts of the majority and dissenting opinions. The issuance today of those opinions in their final form will demonstrate the general accuracy of the information divulged to *The Legal Times*.

The seriousness of this violation cannot be overstated. Each member of this panel has been aggrieved by it, as have the parties who brought this case to us for adjudication. Moreover, because one or more of their number has been guilty of a willful breach of trust, this incident must cast a shadow over the dozen or more able young law clerks who had become privy to the preliminary drafts. I say "willful" because the information in the published reports was too detailed to have been the product of inadvertent disclosures.

We cannot, of course, repair the damage that may already have been done to one or more of the parties as a result of this premature disclosure. But we can and must take steps not only to ensure against a repetition in the future, but to demonstrate the seriousness with which we take this violation. I believe the appropriate measure is for this court to initiate a formal investigation in an effort to identify the source or sources of this disclosure, and I urge my colleagues to do so.

The hemorrhaging of confidential information has become endemic in the legislative and executive branches of our government, with untold cost to their ability to function. It is essential that we prevent

this disease from invading the judiciary, as this would inevitably undermine the public confidence that is one of the major strengths of our legal system.

MIKVA, Chief Judge, dissenting:

When the Supreme Court decided *Metro Broadcasting* in 1990, the opinion was criticized vigorously for its indulgent approval of an affirmative action program adopted by the FCC and approved by Congress. "The Court abandons [its] traditional safeguard against discrimination for a lower standard of review, and in practice applies a standard like that applicable to routine legislation," Justice O'Connor wrote in dissent. *Metro Broadcasting, Inc. v. FCC,* 497 U.S. 547, 110 S.Ct. 2997, 3029, 111 L.Ed.2d 445 (1990). Justice Kennedy, for his part, compared the decision's "relaxed standard of review" to *Plessy v. Ferguson,* 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896). *Id.* 110 S.Ct. at 3044.

The Supreme Court, of course, may now decide to overrule *Metro Broadcasting* and to require strict scrutiny of Congress's affirmative action policies, as the four dissenters urged. But as appellate judges, our duty is to follow Supreme Court precedents, not to anticipate them. And it strikes me as impossible to reconcile the Supreme Court's decision in *Metro Broadcasting* with my colleagues' decision today.

The Supreme Court held that Congress may require the FCC to make certain broadcasting licenses available only to minorities; yet this Court reaches the surprising conclusion that Congress may *not* require the FCC to adopt a far milder and far less discriminatory preference program for women. Although they pay lip service to Justice Brennan's majority opinion, my colleagues apply in practice the more exacting scrutiny of Justice O'Connor's dissent.

My colleagues point to only one difference between this case and *Metro*: the statistics in one report showed a greater correlation between minority ownership and programming diversity than between female ownership and programming diversity. This poses an interesting question for social scientists, but not for judges. The study that my colleagues invoke to strike down the preference explicitly concluded that there *is* a link between female ownership and programming diversity. The study showed that stations owned by women are 20% more likely than stations owned by men to broadcast "women's programming," and about 30% more likely than stations owned by non-minorities to broadcast "minority programming." My colleagues do not share with us the text or history of the Equal Protection clause that tells them that a 20% or 30% increase is unconstitutional, while a larger increase is not. And even though the Supreme Court in *Metro* cited empirical studies offered by amicus groups rather than by the FCC or Congress, my colleagues ignore similar studies that provide more of the statistics they require.

In striking down the preference policy, my colleagues have done precisely what the Supreme Court forbids them to do: they have rejected Congress's conclusion that more female owners of broadcast stations will lead to more diverse programming, even though *Metro* says repeatedly that courts should *defer* to Congress's conclusions about the link between ownership and programming, as long as the conclusions reflect reasoned analysis rather than archaic stereotypes. *Metro's* holding is consistent with a long line of gender cases; and this, after all, is a case about gender, not race. Applying the Supreme Court's test, I think Congress clearly used reasoned analysis when it concluded that increasing the number of women who own and manage television and radio stations will increase programming diversity. And it would be hard to conclude that the gender preference *reflects* outdated stereotypes, since the FCC and Congress designed it to *reduce* outdated stereotypes. My colleagues are free to question the wisdom of the gender preference, but the Supreme Court forbids them (for now) from striking the policy down.

I cannot join them, and respectfully dissent.

\*       \*       \*

A. *The* Metro *Case*

Mr. Lamprecht was understandably nervous when the Supreme Court agreed to hear the *Metro* case. He was so convinced,

in fact, that his pending challenge to the FCC's gender preference would stand or fall on the Supreme Court's decision about the FCC's racial preferences, that he filed an amicus brief in *Metro* confessing his fears:

> The preferential treatment policy employed by the Commission to advance women *is a component* of its more comprehensive preference policy toward minority applicants. This Court's ruling with respect to the constitutionality of the FCC's minority preference policy in the case *sub judice will necessarily affect, and may well prove determinative of, amicus*'s pending challenge to the Commission's female preference scheme.

Brief of Amicus Curiae Jerome Thomas Lamprecht In Support of Petitioner at 2, *Metro Broadcasting*, 497 U.S. 547, 110 S.Ct. 2997, 111 L.Ed.2d 445 (1991) (emphasis added).

Mr. Lamprecht had good reason to be apprehensive. The FCC's gender preference is far milder than its race preferences, and if the Supreme Court upheld the latter, it seemed unlikely that lower courts could strike down the former. The race policies reviewed in *Metro* include two separate programs—a "distress sale" policy that makes certain broadcast licenses available to minorities alone; and a preference policy that makes race a "plus factor" to be weighed with other factors in comparative hearings open to minorities and non-minorities. *Metro*, 110 S.Ct. at 3005. The gender policy is far less severe. There is nothing remotely like a set-aside—no "distress sale" for women that excludes men from consideration. There is only a preference that makes gender a "plus factor" to be weighed against other factors; and the Supreme Court has consistently approved affirmative action programs in which race or sex are one of many factors considered in open competition. *See, e.g., Johnson v. Transportation Agency*, 480 U.S. 616, 641–42, 107 S.Ct. 1442, 1456–57, 94 L.Ed.2d 615 (1987); *id.* at 649, 656, 107 S.Ct. at 1461, 1464 (O'Connor, J., concurring).

The "plus factor" awarded for gender, furthermore, is less valuable than the "plus factor" awarded for race. According to the FCC, the "merit for female ownership and participation is warranted upon essentially the same basis as the merit given for black ownership, but ... *it is a merit of lesser significance.*" *Mid–Florida Television Corp.*, 69 F.C.C.2d 607, 652 (Rev.Bd. 1978), *set aside on other grounds*, 87 F.C.C.2d 203 (1981) (emphasis added) (awarding a "slight" merit to female applicant while granting "substantial" merit to black applicant). Since the FCC's gender preference has far less bite than its racial preferences, Mr. Lamprecht was right to worry that a favorable decision in the *Metro* case would doom his own.

The *Metro* decision, when it came, fulfilled Mr. Lamprecht's worst fears. A majority of the Court reaffirmed a position that had previously won only a plurality: that "benign, race-conscious measures mandated by Congress" should be reviewed under intermediate rather than strict scrutiny. 110 S.Ct. at 3008–09. The opinion repeatedly stressed the importance of deferring to Congress's conclusions about the connection between station ownership and programming diversity, as long as the conclusions were based on reasoned analysis rather than archaic stereotypes. In light of the fact that the Supreme Court has traditionally treated gender classifications much more permissively than racial classifications, it now seemed indisputable that *Metro's* approval of the FCC's racial preferences would compel appellate courts to uphold the FCC's gender preference.

My colleagues, however, have reached the unexpected conclusion that *Metro* "compels us to *strike down* the program." *Ante* at 391 (emphasis added). Their analysis is easily summarized. They agree that the program is subject to intermediate scrutiny—that it must be upheld if it is "substantially related" to an "important governmental objective." They concede that encouraging diverse programming is an "important" goal for the government to pursue. But they conclude that the gender preference program is not "substantially related" to the goal of broadcast diversity because they are not convinced by some of the statistical evidence Congress had before it. In my view, they turn *Metro* on its head.

Justice Brennan's opinion stresses the importance of deference to Congress so often the point is hard to miss. "It is of *overriding significance* in these cases that the FCC's ... ownership programs have been specifically approved—indeed mandated—by Congress." *Metro*, 110 S.Ct. at 3008 (emphasis added). Once again: "The *FCC's* conclusion that there is an empirical nexus between minority ownership and broadcasting diversity is a product of its expertise, and *we accord its judgement deference.*" *Id.* at 3011 (emphasis added). And finally: "[B]oth Congress and the Commission have concluded that the minority ownership programs are critical means of promoting broadcast diversity. We must give *great weight* to their joint determination." *Id.* at 3016 (emphasis added).

Here is the central distinction (which my colleagues quote selectively, *ante* at 391–392):

> Although we do not " 'defer' to the judgment of the Congress and the Commission *on a constitutional question,*" ... we must pay close attention to the expertise of the Commission and the factfinding of Congress *when analyzing the nexus* between minority ownership and programming diversity. With respect to this "complex" *empirical question,* we are required to give *"great weight"* to the decisions of Congress and the experience of the Commission."

*Id.* at 3011 (emphasis added) (citations omitted). The holding of *Metro*, in other words, is that although courts should not defer to Congress on constitutional questions, we *should* defer—or give "great weight"—to Congress on empirical questions. I see no difference between "great weight" and "deference," which the Supreme Court and this Court have consistently treated as synonyms. *See, e.g., Rostker v. Goldberg*, 453 U.S. 57, 64, 101 S.Ct. 2646, 2651, 69 L.Ed.2d 478 (1981); *Commonwealth Edison Co. v. United States Dep't of Energy*, 877 F.2d 1042, 1045 (D.C.Cir.1989).

This is the central point of *Metro*, and my colleagues do not acknowledge it. There is not even a pretense of deference to Congress anywhere in their opinion. On the contrary, they *refuse* to defer to Con-

gress because they themselves are not convinced by one report of the Congressional Research Service. But *Metro* does not say that courts may reject Congress's factual conclusions if they themselves are not convinced by the statistical evidence. Nor does it say what my colleagues say it says: "Any 'predictive judgements' concerning group behavior and the differences in behavior among different groups must at the very least be sustained by meaningful evidence." *Ante* at 393. *Metro* says that courts must defer to Congress's judgement that there is a link between ownership and broadcast diversity as long as "the policies are ... a product of ' "analysis" ' rather than a ' "stereotyped reaction" ' based on ' "[h]abit." ' " *Metro*, 110 S.Ct. at 3018 (citation omitted).

### B. *The Gender Cases*

This conclusion was not new with *Metro*. In a long line of gender cases, the Court has made clear that the underlying purpose of the legal test that requires a gender classification to be "substantially related" to "important objectives" is to make sure that the government is not making distinctions between men and women based on "archaic and stereotypic notions." *Mississippi University for Women v. Hogan*, 458 U.S. 718, 725, 102 S.Ct. 3331, 3336, 73 L.Ed.2d 1090 (1982). As Justice O'Connor wrote for the Court:

> The purpose of requiring that close relationship [between means and ends] is to assure that the validity of a classification is determined through reasoned analysis rather than through the mechanical application of traditional, often inaccurate assumptions about the proper role of men and women.

*Id.* at 725–26, 102 S.Ct. at 3337. In subsequent cases, the Court has reaffirmed the "firmly established principle" that the focus of the "substantial relationship" test is to insure that gender classifications are based on reason rather than stereotypes. *See Heckler v. Mathews*, 465 U.S. 728, 744, 750, 104 S.Ct. 1387, 1398, 1401, 79 L.Ed.2d 646 (1984). My colleagues suggest that intermediate scrutiny in the gender cases is

about statistics, not stereotypes. But the cases themselves say the opposite.

The Supreme Court, for example, has upheld logical distinctions between men and women, even when the empirical evidence was open to question. In *Michael M. v. Superior Court*, 450 U.S. 464, 101 S.Ct. 1200, 67 L.Ed.2d 437 (1981), the Court upheld a state statute punishing men, but not women, who have sexual relations with minors. The Court found that the law did not "res[t] on 'the baggage of sexual stereotypes,'" *id.* at 476, 101 S.Ct. at 1208 (citation omitted), but conceded that the substantial relationship of the law to the goal of reducing teenage pregnancy was "at best an opaque one," *id.* at 474 n. 10, 101 S.Ct. at 1207 n. 10. Rather than requiring the state to produce statistical evidence to support the nexus, however, the Court said: "[w]here such differing speculations as to the effect of a statute are plausible," courts should defer to those " 'armed ... with the knowledge of the facts and circumstances concerning the passage and potential impact' " of the statute. *Id.* (citation omitted).

In *Rostker v. Goldberg*, 453 U.S. 57, 101 S.Ct. 2646, 69 L.Ed.2d 478 (1981), similarly, the Court upheld Congress's decision to authorize draft registration for men but not women because it found that the gender classification "was not the ' "accidental byproduct of a traditional way of thinking about females." ' " *Id.* at 74, 101 S.Ct. at 2656. The justices sharply criticized the lower court for relying on the testimony of military experts to reject Congress's conclusion that conscripting women would not free up men for battle. "[The] District Court was quite wrong in undertaking an independent evaluation of this evidence, rather than adopting an appropriately deferential examination of Congress's evaluation of that evidence." *Id.* at 82–83, 101 S.Ct. at 2661.

When the Court has struck down gender classifications, it has done so because they rested on impermissible stereotypes, *whether or not* they were supported by statistical evidence. My colleagues misread *Califano v. Westcott*, 443 U.S. 76, 99 S.Ct. 2655, 61 L.Ed.2d 382 (1979), which they say struck down an AFDC program *"because"* no empirical evidence supported Congress's judgment. *Ante* at 396. But the *Westcott* Court said clearly that the gender classification was not substantially related to its objective because it was, "rather, part of the 'baggage of sexual stereotypes' that presumes that the father has the 'primary responsibility to provide a home and its essentials,' while the mother is the ' "center of home and family life." ' " *Id.* at 89, 99 S.Ct. at 2663 (citations omitted). The absence of statistics was significant only because it showed that the challenged provision rested on stereotypes, not reason.

The Court has also struck down gender classifications that *are* supported by statistics, when it has concluded that the classifications also rested on stereotypes. In *Weinberger v. Wiesenfeld*, 420 U.S. 636, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975), for example, the Court found unconstitutional a provision of the Social Security Act authorizing benefits to widows but not widowers. Congress justified the statute on the ground that men are more likely than women to be primary supporters of their spouses and children, and the Court found the notion "not entirely without empirical support." *Id.* at 645, 95 S.Ct. at 1232. It invalidated the provision nevertheless, holding that the statistics did not "justify"—in a normative sense—"the denigration of the efforts of women who do work." *Id.* My colleagues cite *Wiesenfeld* to support their claim that Congress's predictive judgments must be sustained by "meaningful evidence." *Ante* at 393. But the *Wiesenfeld* Court did not strike down the provision because the statistical evidence was not meaningful. It struck down the provision because it rested on an " 'archaic and overbroad generalization' " that men's wages, but not women's wages, are vital to family support. *Id.* at 643, 95 S.Ct. at 1231 (citation omitted).

My colleagues also read too much into *Craig v. Boren*, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976). In striking down an Oklahoma law that established different drinking ages for men and women, the

*Craig* majority found the evidence supporting the age differential "not trivial in a statistical sense," *id.* at 201, 97 S.Ct. at 459. And in concurring opinions, Justices Powell and Stevens conceded that "the statistics ... do tend generally to support the view that young men drive more, possibly are inclined to drink more, and—for various reasons—are involved in more accidents than young women." *Id.* at 211, 97 S.Ct. at 464. (Powell, J., concurring); *see also id.* at 213, 97 S.Ct. at 465 (Stevens, J. concurring). In the Court's view, however, the statistics could "hardly ... form the basis for employment of a gender line as a classifying device." *Id.* at 201, 97 S.Ct. at 459. Although the Court did review the statistical evidence, it struck down the law only after pointing out that the different drinking ages were based on "social stereotypes." *Id.* at 202 n. 14, 97 S.Ct. at 459 n. 14. "The question," as Justice Stevens explained, "is whether the traffic safety justification put forward by the State is sufficient to make an *otherwise offensive.* classification acceptable." *Id.* at 213, 97 S.Ct. at 465 (Stevens, J., concurring) (emphasis added).

Later cases made clear what was implicit in *Craig:* courts must find that gender classifications rest on offensive stereotypes, rather than reasoned analysis, before striking them down. Nothing in my colleagues' long footnote calls this simple proposition into question. *Ante* at 393–395 n. 3. I agree, of course, that Congress's gender classifications cannot be upheld if they rest on premises that are not true. But I cannot agree that a logical premise is presumptively false until Congress commissions statistics to support it. Statistics, obviously, are one way to support a premise; but the cases make clear that Congress may also rely on logic—on "reasoned analysis," "permissible reasoning" or "legitimate inferences." The debate, in this case, however, is essentially semantic, since when the dust has settled my colleagues do not point to *any* stereotypes on which Congress relied.

Rather than supporting my colleagues' view that gender classifications must be supported by statistical evidence, *Craig v.*

*Boren* warns of the dangers of their approach:

> It is unrealistic to expect either members of the judiciary or state officials to be well versed in the rigors of experimental or statistical technique. But this merely illustrates that proving broad sociological propositions by statistics is a dubious business, and one that inevitably is in tension with the normative philosophy that underlies the Equal Protection Clause.

*Id.* at 204, 97 S.Ct. at 460.

Neither *Metro,* nor *Westcott,* nor *Craig,* nor *Wiesenfeld,* in short, say what my colleagues say they say: that courts can overturn congressionally mandated gender classifications whenever they are not convinced by the statistical evidence before Congress. On the contrary, *Metro,* following a long line of gender cases, says that the purpose of intermediate scrutiny is to ensure that Congress's judgments are based on reasoned analysis rather than archaic stereotypes.

## C. *The Government's Objectives*

Before deciding whether reasoned analysis supports Congress's judgment that the gender preference is · substantially related to its objectives, we must be clear about which objectives, precisely, Congress endorsed. "Implicit in the government's judgment," my colleagues suggest, is the assumption that women are more likely than white men to broadcast "women's programming" or other targeted programming. · *Ante* at 395. In fact, Congress did *not* emphasize the idea of "women's" or "minority" or any other "targeted" programming when it endorsed the FCC's gender preference. Congress's repeated statements on the subject show that it thought increased female ownership would promote the broader (and less controversial) goal of increasing *programming diversity in general.* My colleagues acknowledge the broader goal sporadically in their opinion, but in applying the intermediate scrutiny test, they focus only on the narrower goal of increasing women's or minority programming. And they strike down the pref-

erence based on a single study that never considered programming for general audiences.

As early as 1982, Congress recognized that women are "significantly underrepresented in the ownership of telecommunications facilities" and that "the American public will benefit by having access to a wider diversity of information sources" if the role of underrepresented groups in broadcasting, such as women, is increased. H.R. No. 97–765 (Conf.Rep.), 97th Cong., 2d Sess. 43, *reprinted in* 1982 U.S.Code Cong. & Adm.News 2288–89; *cf. Random Selection/Lottery Systems—Third Notice of Proposed Rule Making*, 95 F.C.C.2d 432, 438 (1983) (noting that women own a majority of only 2.8% of all televisions stations). The *Metro* Court itself cited the report accompanying Congress's 1987 directive that the FCC preference policies stay in place. The report of the Appropriations Committee explained: "The Congress has expressed its support for such policies in the past and has found that promoting diversity of ownership of broadcast properties satisfies important public policy goals. Diversity of ownership results in diversity of programming *and* improved service to minority *and women* audiences." S.Rep. No. 1982, 100th Cong., 1st Sess. 76 (1987) (quoted in *Metro*, 110 S.Ct. at 3016) (emphasis added). The Committee recognized the continuity of congressional action ·in· approving the minority and the gender preferences, noting that "[i]n approving a lottery system for the selection of certain broadcast licensees, Congress *explicitly* approved the use of preferences to promote minority *and women* ownership." *Id.* at 76–77 (also quoted in *Metro*, 110 S.Ct. at 3016) (emphasis added).

Two years later, Senator Hollings, chair of the authorizing committee and the appropriations subcommittee for the FCC, described the repeated inclusion of the appropriations rider in subsequent appropriations bills "as an indication of Congress' continuing support for these policies." *Minority Ownership of Broadcast Stations: Hearing Before the Subcomm. on Communications of the Senate Comm. on Commerce*, 101st Cong., 1st Sess. at 3

(1989). At the same time, the Senate heard testimony that "a specific definition for the term 'female programming' " was not·necessary because "[t]he purpose of the female preference is to increase female ownership in order to promote *viewpoint diversity.*" *Id.* at 78 (emphasis added).

In the 1987 appropriations rider itself, Congress endorsed the rationale of the FCC's gender preference. *See* Continuing Appropriations Act for Fiscal Year 1988, Pub.L. 100–202, 101 Stat. 1329, 1329–31 (1987) (specifically approving preference policies as developed by the Commission). And the FCC had " 'recognized female involvement as contributing to potential *diversity of programming* and awarded merit in a comparative proceeding *on that basis.*' " *Horne Industries, Inc.*, 94 F.C.C.2d 815, 823 n. 32 (1983) (quoting *Minority Ownership of Broadcast Facilities*, 69 F.C.C.2d 1591, 1593 n. 9 (1978)) (emphasis added); *see also Third Notice of Proposed Rulemaking*, 95 F.C.C.2d at 435–36; *Mid-Florida Television Corp.*, 69 F.C.C.2d at 652.

All this is to say that the "governmental objective" in this case, as in *Metro Broadcasting*, is not merely to increase programming specifically targeted at women or minorities, but to increase programming diversity in general. "Congress and the FCC have selected the minority ownership policies primarily to promote *programming diversity*," the Court said in *Metro*, and "the interest in enhancing *broadcast diversity* is, at the very least, an important governmental objective." 110 S.Ct. at 3010 (emphasis added). Although Congress did not provide a precise definition of "programming diversity," the· *Metro* Court offered the following definition: the expectation that "varying perspectives will be more fairly represented on the airwaves." 110 S.Ct. at 3018. Programming diversity includes, the Court made clear, the "selection of topics for news coverage and the presentation of editorial viewpoint," as well as avoiding stereotypes on general programming. *Id.* at 3017; *see also Steele v. FCC*, 770 F.2d 1192, 1208–09 (D.C.Cir.1985) (Wald, J., dissenting).

D. *The Nexus*

1. Reasoned Analysis

In addition to obscuring the government's objectives, my colleagues ignore the *Metro* Court's central conclusion that the minority preferences were "substantially related" to the objectives *because* "the reasoning employed by the Commission and Congress is permissible," 110 S.Ct. at 3018. The reasoning upheld in *Metro* is hard to distinguish from the reasoning underlying the gender preference. Noting that "the nexus between ownership and programming 'has been repeatedly recognized by both the Commission and the courts,'" 110 S.Ct. at 3015 (quoting H.R.Conf.Rep. No. 97–765, p. 40 (1982)), the *Metro* Court went on to endorse Congress's logic by comparing it to the logic of the jury selection cases:

> We have recognized, for example, that the fair cross-section requirement of the Sixth Amendment forbids the exclusion of groups on the basis of such characteristics as race and gender from a jury venire because "[w]ithout that requirement, the State could draw up jury lists in such manner as to produce a pool of prospective jurors disproportionately ill disposed towards one or all classes of defendants, and thus more likely to yield petit juries with similar disposition."

110 S.Ct. at 3018 (quoting *Holland v. Illinois*, 493 U.S. 474, 110 S.Ct. 803, 807, 107 L.Ed.2d 905 (1990)). "It is a small step from this logic," the *Metro* Court said, "to the conclusion that including minorities in the electromagnetic spectrum will be more likely to produce a 'fair cross section' of diverse content." *Id.* It is an even smaller step from this logic to the conclusion that including *women* in the broadcast spectrum will be more likely to produce a "fair cross section" of diverse content. The first jury venire cases, after all, concerned women, not minorities. As early as 1946, the Supreme Court suggested that female participation in the jury system is necessary if that process is to reflect "a cross section of the community." *Ballard v. United States* 329 U.S. 187, 191, 67 S.Ct. 261, 263, 91 L.Ed. 181 (1946). The Court stressed that while neither men nor women think or act as a class,

> [t]he truth is that the two sexes are not fungible; a community made up exclusively of one is different from a community composed of both; the subtle interplay of influence one on the other is among the imponderables. To insulate the courtroom from either may not in a given case make an iota of difference. Yet a flavor, a distinct quality is lost if either sex is excluded.

*Id.* at 193–94, 67 S.Ct. at 264. My colleagues have no patience for "subtle interplay" or "distinct quality," insisting on numbers instead.

The jury cases, combined with *Metro*, make it clear that Congress's assumptions about ownership by women and diversity of programming are permissible rather than impermissible. It is clearly "a legitimate inference for Congress and the Commission to draw that as more [women] gain ownership and policymaking roles in the media, varying perspectives will be more fairly represented on the airwaves." *Metro*, 110 S.Ct. at 3018. (citation omitted).

As a matter of logic, in fact, the mild gender preference that my colleagues say is unconstitutional seem much more directly related to the goal of programming diversity than the minority distress sale policy upheld in *Metro*. As Justice O'Connor pointed out in her *Metro* dissent, "the distress sale policy provides preferences to minority owners who neither intend nor desire to manage the station in any respect." 110 S.Ct. at 3041–42. The FCC awards a gender credit, by contrast, *only* where the prospective female owners will devote "substantial amounts of time on a daily basis" to the management of the station. *Policy Statement on Comparative Broadcast Hearings*, 1 F.C.C.2d 393, 395 (1965). In fact, under FCC rules, credit is awarded only to the extent that female owners will hold a policy-making position and the credit is proportionate to the extent of her involvement. *New Continental Broadcasting Co.*, 96 F.C.C.2d 544, 546–47 (Rev.Bd.1983). In practice, this means that well-qualified women have been rejected

for licenses because the FCC thinks they will not be sufficiently involved in daily programming decisions. *See, e.g., Alexander S. Klein, Jr.,* 69 F.C.C.2d 2134, 2146–47 (Rev.Bd.1978). Given the fact that female owners who benefit from the gender preference are more likely than minority distress sale owners actually to influence programming, I do not understand how my colleagues can conclude that minority ownership is logically related to the goal of programming diversity, but female ownership is not.

The Court in *Metro* also emphasized the fact that the distress sale policy placed only a "slight" burden on non-minorities. 110 S.Ct. at 3026–27. "In practice," the Court pointed out, "distress sales have represented a tiny fraction—less than four tenths of one percent—of all broadcast sales since 1979." *Id.* at 3027. In the case of gender preference, the burden on men is equally slight: out of 8,720 stations responding to an FCC survey, only *81* stations said they had benefited from the minority *or* women's preference program, less than 1%. Congressional Research Service, *Minority Broadcast Station Ownership and Broadcast Programming: Is There a Nexus?* 41 (June 29, 1988) [hereinafter *CRS Report*]. And since the gender preference does not exclude men while the distress sales the Supreme Court approved do exclude "non-minorities," the logic of *Metro* suggests that the burden is even slighter.

2. Archaic Stereotypes

In light of *Metro* and the gender cases, unless statistics disproved the link, I think that my colleagues could strike down the preference policy only if they held that Congress's assumptions about female ownership and programming diversity are based on archaic stereotypes. They never suggest this, unsurprisingly, because Congress has not relied on stereotypes of any kind. It has *not* assumed that women "share some cohesive, collective viewpoint," *Metro,* 110 S.Ct. at 3018, or that female journalists will approach stories about the federal budget, school prayer, voting rights, or foreign relations any dif-

ferently than male journalists would. *Cf. Roberts v. United States Jaycees,* 468 U.S. 609, 628, 104 S.Ct. 3244, 3255, 82 L.Ed.2d 462 (1984). Nor has Congress endorsed the similarly controversial proposition that men and women think differently about most questions. (If it had, the constitutional issue might be closer: the Fourteenth Amendment does not enact Ms. Betty Friedan's *The Second Stage* ). It has merely assumed that some female programmers will choose to emphasize different subjects—breast cancer, say, or glass ceilings in the workplace—than male programmers will. The assumption strikes me as innocuous to the point of being obvious.

The familiar response is that the editorial perspectives of the *Washington Post* and the *New York Times* are hard to distinguish even though the *Post* was, until recently, published by a woman, and the *Times* is published by a man. *See, e.g., Steele v. FCC,* 770 F.2d 1192, 1199 (D.C.Cir.1985). But if constitutional decisions must turn on anecdotes, there are plenty to the contrary. For example, when Jennifer Lawson was appointed to be the Public Broadcasting Service's first executive vice president for national programming, she announced that her main goal was to "make PBS programming a better reflection of the cultural, political, and sexual diversity of the U.S." David Klinghoffer, *All–Powerful Programming Czar Promises the Era of the Multicultural,* Washington Times, March 6, 1991, at E1. And the Supreme Court in *Metro* stressed that "Congressional policy does not assume that *in every case* minority-ownership and management will lead to more minority-oriented programming or to the expression of a discrete 'minority viewpoint' on the airwaves ... Rather both Congress and the FCC maintain simply that expanded minority ownership of broadcast outlets will, *in the aggregate* result in greater broadcast diversity." 110 S.Ct. at 3016 (emphasis added).

It would be hard, in any case, for my colleagues to maintain that gender preference will promote archaic stereotypes, since the FCC and Congress have concluded that

gender preference will *reduce* archaic stereotypes. In the late 1970s, the Civil Rights Commission published two reports concluding that the broadcast media often portrayed women and minorities in stereotypical ways, and that the problem could be addressed by increasing the number of women and minority decisionmakers in radio and television. *See Window Dressing on the Set: Women and Minorities in Television, A Report of the United States Commission on Civil Rights* (1977) (cited by the Commission in its *Statement of Policy on Minority Ownership,* 68 F.C.C.2d at 980 n. 9); *see also Window Dressing on the Set: an Update, A Report of the United States Commission on Civil Rights* (1979). A 1990 report finds that the stereotypes persist, and also concludes that female programmers would reduce them. National Commission on Working Women, *What's Wrong With This Picture? The Status of Women on Screen and Behind the Camera in Entertainment TV* (1990). Just as the *Metro* Court concluded that minority owned stations tend to "avoid racial and ethnic stereotypes in portraying minorities," 110 S.Ct. at 3017, it was both reasonable and permissible for Congress and the Commission to conclude that female owned stations would avoid gender stereotypes.

In their briefs and at oral argument, lawyers for the FCC tried to summarize the logic that supports Congress's conclusions, but my colleagues have belittled their efforts at every turn. "The Commission's brief cites nothing," the majority asserts, "that might support its predictive judgment that women owners will broadcast women's or minority programming at any different rate than will men." *Ante* at 395. But the Commission's brief cites precisely the kind of reasoned analysis that satisfied the Supreme Court in *Metro. See* Appellant's Brief at 34–36 (citing, among other things, jury venire analogy and Window Dressing on the Set Report). My colleagues reproduce a long exchange at oral argument in which, they say, the Commission's lawyer confirmed that the record in this case lacks evidence of a substantial relationship. But, as the transcript makes

clear, the questioning judge repeatedly cut off the lawyer's attempt to explain the government's reasoning, demanding he produce "evidence" or a "basis in fact" for the conclusion. To my mind, the excerpt helps to show how starkly my colleagues have misunderstood the nature of the inquiry into substantial relationship, and in their hunger for statistical evidence, have overlooked reasoned analysis.

### E. *The Statistics*

I am reluctant to accept my colleagues' invitation to scrutinize the statistics strictly, since *Metro* tells us that Congress's empirical conclusions deserve "great weight." 110 S.Ct. at 3011. But my colleagues' treatment of the data is so unconvincing that their conclusions cannot be defended, even on their own terms. And even though the *Metro* Court found empirical support for Congress's conclusions *outside* of the administrative record, my colleagues make no attempt to consider the host of other studies that provide more of the statistics they demand.

### 1. The CRS Report

My colleagues have decided to reject Congress's findings after parsing a single report prepared by the Congressional Research Service, which merited a single footnote in *Metro,* 110 S.Ct. at 3017 n. 31, and which received no more attention in the opinion than any other study. Their odd treatment of the report is obvious from the beginning of their analysis. The title of the report asks "Is There a Nexus?" and, according to my colleagues, the report, "answer[s] its own question, at least with respect to women. The answer it gives is 'no.'" *Ante* at 396. But the answer it gives is plainly "yes." "Based on th[e report's] findings," the cover page of the CRS study concludes, "there is a *strong indication* that minority *and women* station ownership result in a greater degree of minority programming." *CRS Report* at cover page (emphasis added); *see also id.* at 44 ("While stations with women owners lag *slightly* behind those with minority owners in programming for minorities gen-

erally, a *substantial percentage* [of women-owned stations] programs for blacks and Hispanic audiences.") (emphasis added). The *Metro* Court took the study's conclusions at face value. Yet my colleagues ignore the central conclusion printed on the face of the study.

I concede that if reliable data conclusively *disproved* Congress's judgments, it might suggest that Congress's analysis was not reasoned. But the CRS study not only fails to disprove Congress's judgments, it clearly supports them. The report concludes, for example, that 35% of stations owned primarily by women are likely to broadcast "women's programming," while just 28% of stations owned by "non-women" are likely to do so. *CRS Report* at 18 (Fig. 9A). That means that the female owned stations are 20% more likely to broadcast women's programming than stations owned by men.

The data also reveal a statistical correlation between female ownership and *minority* programming. Twenty-six percent of stations with female owners broadcast programming targeted to Blacks, while 20% of stations owned by "non-Blacks" do. *CRS Report* at 14 (Fig. 5A). In other words, stations owned in part by women are 30% more likely to broadcast Black programming than stations owned by people who are not Black. The statistical correlation between women owners and programming directed at other minority groups is about the same. *See CRS Report* at 15–17

To put the percentages in perspective: In the 1952 election, a landslide, Dwight Eisenhower won 55% of the popular vote, to Adlai Stevenson's 44% (about 33.5 million votes to about 27 million). The difference between the votes received by the two candidates? Only 25%.

A correlation of that size does not satisfy my colleagues. But they do not tell us why that link does not satisfy the Constitution. The Fifth Amendment does not identify the mystical point at which an empirical correlation becomes—to use my colleague's word—"meaningful;" and judges have no basis, except their own policy preferences, for telling Congress it could not

conclude that a 20% or 30% increase in women's or minority programming was enough to justify the gender preference.

Besides downplaying the significance of the statistical correlation in the CRS report, my colleagues make three other observations about the data. But the data do not prove what my colleagues say.

* My colleagues stress that stations in which women own less than 50% of equity are as likely to broadcast women's programming as stations in which women own more than 50%. *Ante* at 397. But that is the wrong comparison. Because the preference policy goes only to women who will also manage (and who will therefore be in a position to influence programming), the more relevant comparison is between women owners who are managers and women owners who are not. And the report makes clear that there is no correlation between owning more than 50% equity and holding a management position. Of the stations reporting that at least one of their owners was also a manager, 55.8% percent said those owners held less than 50% interest in the station, while just 44.2% reported those owners held more than a 50% interest in the station. *CRS Report* at 39.

The right question is whether a correlation exists, on the whole, between female *owner-managers* and diverse programming. The report demonstrates that correlation and likely understates it, because, according to the statistics, only 18% of the female owners in the survey were also managers. *CRS Report* at 40. The report also understates the correlation because it asked only about programming specifically targeted at women, minorities, children and senior citizens, and not at general audiences. *CRS Report* at 54.

* My colleagues focus on data from five large cities—a subsection of the report—which they claim call into question the link between female owners and women's programming. *Ante* at 397. But they fail to mention that data from the same cities suggests a significant link between female ownership and minority programming. About 30% of stations with female owners target Black audiences, compared to only

about 23% of stations without minority owners—a difference of 30%. *CRS Report* at 25. About 27% of stations with female owners target Hispanic audiences, compared to only about 20% of stations without minority owners—a difference of 35%. *Id.* The differences are similar for programming directed at Asian, Pacific Islander, Native American and Alaskan audiences. *Id.*

\* My colleagues rely on the report's finding that radio stations with at least one women owner use broadcasting formats in nearly the same order as stations owned by "non-minorities" (which includes men and women). *Ante* at 397. That means that stations with female owners are about as likely to use an "All News" or "Talk" or "Golden Oldies" format as stations without any minority ownership. But my colleagues' focus on formats strikes me as irrelevant at best, and unsettling at worst. They cannot possibly expect stations owned by women to program soft, "feminine," music, or to replace a "Country Western" format with "Adult Contemporary." The point is that more female owner-managers will likely enhance the diversity of programming *within* the existing formats, and the study certainly does not disprove it.

## 2. Other Studies

Finally, if my colleagues want more statistics, there are plenty to support Congress's position. When the Supreme Court in *Metro* noted that Congress's conclusion about the nexus between programming and diversity "is corroborated by a host of empirical evidence," 110 S.Ct. at 3017, it *did not limit itself* to studies that Congress had consulted, or that appeared in the administrative record or FCC brief. Apart from the CRS report, in fact, every study the Supreme Court cited (including unpublished doctoral dissertations and presentations at obscure symposia) came directly from amicus briefs supplied by organizations like the NAACP and the Congressional Black Caucus. This Court, too, could have called for amicus briefs on the statistical question (or accepted the brief that was offered) and our failure to do so looks less than sporting, since our decision seems to turn on the absence of them.

Nevertheless, statistical support for the gender preference is not hard to find. Despite the fact that *Metro*, for example, concerned race rather than gender, the Court received one amicus brief showing a clear statistical correlation between women programmers and women's programming. An organization called American Women in Radio and Television surveyed the radio programs that had received National Commendation Awards in 1986 for presenting issues of particular interest to women or for presenting women in a "positive and realistic light." Women represented 58.5% of the producers, 84.2% of the writers, and 92.9% of the reporter/hosts. Brief Amicus Curiae of American Women in Radio and Television, Inc. in Support of Respondents at 20–21, *Metro Broadcasting v. FCC*, 497 U.S. 547, 110 S.Ct. 2997, 111 L.Ed.2d 445 (1991). Women, by contrast, accounted for only 29.8% of broadcast managers or professionals in general. *See* FCC, Cable and Broadcast Industry Equal Employment Opportunity Trend Report (1986).

The statistics for producers are relevant, rather than "irrelevant," *ante* at 396 n. 7, because the gender preference goes only to owners/*managers* who are also involved in programming decisions. The majority persistently ignores this fact, except to suggest that female owner/managers can influence programming only by hiring female producers and writers. *Id.* In fact, however, FCC cases make clear that the female owner/managers who receive preferences are *themselves* involved in programming decisions. In *Coastal Broadcasting Partners*, 6 FCC Rcd. (No. 14) 4242 (1991), for example, the Commission gave a preference to a female owner/manager who proposed to work full-time as Director of Programming and Public Affairs, a role in which she would "focus on program development, program acquisitions, ascertainment of needs and public affairs programs and announcements." *Id.* at 4244–45. She would also serve on a programming committee responsible for "set[ting] programming policy," and would "see to it that

those policies are followed and [would] carry them out." *Id.* at 4245.

If this case is appealed to the Supreme Court, I have no doubt that a host of amici will submit "a host of empirical evidence" to "corroborate" Congress's judgment. In the meantime, a quick skim of the best-seller lists, the computer banks, and the rejected amicus brief, suggests the range of the studies they will have at their disposal. Susan Faludi's *Backlash*, for example, devotes an entire chapter to the proposition that female programmers in the 1980s who tried to portray single or working women as independent professionals rather than as miserable careerists or as sex symbols, were challenged by male programmers at every turn. She gives a host of examples, and cites several studies to prove her point. SUSAN FALUDI, BACKLASH, 140–168 (1991) (*citing* National Commission on Working Women, "Women Out of View: An Analysis of Female Characters on 1987–88 TV Programs," (1987); Davis, *Portrayals of Women in Prime-Time Network Television: Some Demographic Characteristics*, 23 SEX ROLES 325–30 (1990)). Other sources include: two symposia co-sponsored by the FCC and American Women in Radio and Television, Inc., "Women in the Telecommunications Marketplace" and "The Woman Entrepreneur"; National Commission on Working Women, *What's Wrong With This Picture? The Status of Women on Screen and Behind the Camera in Entertainment TV* (1990); Herbert, *Study Charges Sexism in Women's Sports Coverage*, L.A. Times, Aug 30, 1990, Part F, p. 2, col. 3 (describing a study prepared by professors at the University of Wisconsin and the University of Southern California); P. Koza, *Kiddie TV Study: "One Smurfette Amid a Host of Smurfs"*, United Press International, July 14, 1982 (describing a study by Boston University professors finding that programs targeted at children presented outdated stereotypes of gender roles). Again, I hardly think these kinds of studies are necessary to decide the constitutional question, but since my colleagues do, there are plenty to go around.

I must also dissent, finally, from my colleagues' paraphrased descriptions of my positions. I do *not* suggest, as they claim, "that the Supreme Court already has decided that the Commission's sex-based policy passes constitutional muster," *ante* at 386 n. 1. I do not suggest "that deference means not just limited factual review, but none at all," *ante* at 392 n. 2. I do not suggest "that a sex based classification might survive intermediate scrutiny even if it rests upon unsupported generalizations about men or women as a group," *ante* at 393 n. 3. And I do not suggest "that a relevant generalization is presumed true (even if unsupported) unless proved otherwise," *id.* I welcome, of course, a vigorous debate. But I think we should debate the more modest propositions actually contained in this dissent.

\*      \*      \*

"The blind use of statistics," Chief Justice Rehnquist has noted, "cannot be permitted to undermine the policies of Congress or erode our decisions on substantive law." *Procter & Gamble Mfg. Co. v. Fisher*, 449 U.S. 1115, 1118, 101 S.Ct. 929, 930, 66 L.Ed.2d 845 (1981) (Rehnquist, J., dissenting from denial of cert.). As a matter of policy, the decision to give a mild preference to women in the assignment of broadcast licenses is open to debate. But as a matter of law, the constitutionality of this affirmative action program is clear—at least until the Supreme Court overturns *Metro* and a long line of gender cases. One of the most unsettling trends in appellate jurisprudence is the tendency of judges who are devoted to the original intention of the framers of the Constitution to ignore the original intentions of elected representatives in Congress. Today my colleagues thwart not only the intentions of Congress and the Executive, but also the intentions of the Supreme Court. I think that the third branch has no business telling the first branch how to make national policy, or what policy to make, and I dissent.