**CHANNEL 51 OF SAN DIEGO, INC., Appellant,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellee,**

and

**Fox Television Stations, Inc., et al., Intervenors.**

No. 95–1128.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 22, 1995.

Decided March 29, 1996.

Stanley S. Neustadt, Washington, DC, argued the cause for appellant, with whom Robert B. Jacobi was on the briefs.

Clifford G. Pash, Jr., Counsel, Federal Communications Commission, Washington, DC, argued the cause for appellee, with whom William E. Kennard, General Counsel, and Daniel M. Armstrong, Associate General Counsel, were on the brief.

Norman P. Leventhal and Barbara K. Gardner, Washington, DC, were on the brief for intervenors Televimex, S.A. de C.V. and Radiotelevisora de Mexico Norte, S.A. de C.V.

Richard S. Rodin and William S. Reyner, Jr., Washington, DC, entered appearances for intervenor Fox Television Stations, Inc.

Before: WALD, SENTELLE and RANDOLPH, Circuit Judges.

SENTELLE, Circuit Judge:

Channel 51 of San Diego, Inc. (Channel 51), the licensee of Television Broadcast Station KUSI–TV, which operates on UHF Channel 51 in San Diego, California, appeals an order of the Federal Communications Commission (FCC) granting a permit to Fox Television Stations, Inc. (Fox), to electronically transmit television programming from the United States to Station XETV, Tijuana, Mexico, for rebroadcast into the United States. Because we hold that the FCC misinterpreted the effect of the North American Free Trade Agreement (NAFTA) on the meaning of the relevant provisions of the Communications Act of 1934, we vacate the portion of the FCC Order granting Fox permission to electronically transmit to XETV and remand the case to the FCC for further proceedings consistent with this opinion.

## I. Statutory and Regulatory Background

Congress enacted the Communications Act of 1934 for the express purpose of "regulating interstate and foreign commerce in communication by wire and radio so as to make available, so far as possible, to all the people of the United States a rapid, efficient, Nation-wide, and world-wide wire and radio communication service." 47 U.S.C. § 151. In keeping with that purpose, the statutory scheme incorporated a licensing system for radio and television stations that broadcast within the United States. Section 309 sets forth the license application procedure and standards to guide the FCC in determining whether to grant an application. Section 309(a) requires the FCC to inquire as to whether the "public interest, convenience, and necessity will be served by the granting" of the application. 47 U.S.C. § 309(a). Section 309(d) and (e) require the FCC to hold an evidentiary hearing if a substantial or material question of fact arises or if the Commission is unable to determine whether the public interest, convenience and necessity justify the granting of the license.

Because broadcasters in many areas of the country could evade the strictures of the act by transmitting their signals across the United States border to a foreign station which could then rebroadcast the signal back into the United States, § 325(c) specifically prohibits such transmissions for rebroadcast without an FCC permit. Section 325(d) provides that the procedures of § 309 shall govern FCC consideration of applications for permits to conduct the cross-border electronic transmission otherwise prohibited by § 325(c). Accordingly, in a § 325 proceed-

ing, the FCC must determine whether the "public interest, convenience, and necessity will be served by the granting" of the § 325 permit. Prior to the present case, the FCC applied the same criteria for meeting the programming standards component of the "public interest, convenience, and necessity" requirement to both a domestic broadcast license proceeding under § 309 and a cross-border broadcast license proceeding under § 325. The issue in this case is whether the FCC has adequately explained its determination that relevant provisions of NAFTA now permit application of a different, more lenient standard in a § 325 proceeding.

In 1972, the FCC addressed the public interest requirement for § 325 permits in *American Broadcasting Cos., Inc.,* 35 F.C.C.2d 1, 24 R.R.2d 471 (1972) [hereinafter *ABC 1972* ], *aff'd per curiam,* 26 R.R.2d 203 (D.C.Cir.), *cert. denied,* 412 U.S. 939 (1973). In 1956, the FCC had granted a § 325 permit to American Broadcasting Companies (ABC) "to transmit its network programming to XETV, Channel 6, Tijuana, Mexico, for broadcast to San Diego, California." *ABC 1972,* 35 F.C.C.2d at 3. The FCC based its 1956 grant on the public interest as it existed at the time, stressing that unless the permit were granted, ABC would have no primary affiliate in San Diego. San Diego viewers would thereby be deprived of a significant increase in programming choice. On appeal, we set aside the 1956 determination on the grounds that the FCC had failed adequately to consider whether XETV's programming was objectionable by United States standards. *Wrather–Alvarez Broadcasting, Inc. v. F.C.C.,* 248 F.2d 646 (D.C.Cir.1957). On remand, however, the FCC again granted ABC's application after considering XETV's programming. *American Broadcasting–Paramount Theatres, Inc.,* 24 F.C.C. 296 (1958).

In 1968, when ABC filed its annual application for renewal, a new station, KCST, UHF channel 39, filed a petition to deny the permit. KCST argued that it could become a San Diego ABC affiliate, that XETV's local programming was "blatantly defective," and that KCST's existence removed the rationale for the original granting of the permit in 1956. *ABC 1972,* 35 F.C.C.2d at 4. Among other things, the FCC determined that XETV's locally oriented programming was "deficient in that it renders no local service meeting the needs and interests of the community" of San Diego. *Id.* at 11. Specifically, the FCC noted that XETV had not produced any local news programming since 1967, did not intend to resume such programming, and had never interrupted its broadcast schedule to air any bulletins of local interest. XETV simply served as "little more than a passive conduit of national network programming." *Id.* The FCC determined that the public interest no longer supported the ABC permit, noting especially that (1) KCST was then present in San Diego and capable of serving as an ABC affiliate, (2) KCST was a UHF station, and denying the XETV permit would further the FCC's policy of encouraging the development of UHF television, and (3) "KCST's programming would meet the needs and interests of the community more effectively" than XETV's. *Id.* at 12. The FCC accordingly denied ABC's permit renewal application, and we affirmed. *American Broadcasting Cos., Inc.,* 35 F.C.C.2d 1, 24 R.R.2d 471 (1972), *aff'd per curiam,* 26 R.R.2d 203 (D.C.Cir.), *cert. denied,* 412 U.S. 939 (1973).

## II. History of Current Proceedings

XETV is still broadcasting today, but it is now affiliated with Fox. Before Fox filed the application at issue in these proceedings, it physically transported network programming destined for the San Diego market to Station XETV, located across the United States/Mexico border. No FCC authorization is required for such an arrangement, known in industry parlance as "bicycling." Bicycling, however, obviously does not allow live broadcasts of any sort, and XETV therefore could not transmit live news and sports programs into San Diego. This situation became problematic—some might say critical—in early 1994, when Fox obtained the right to broadcast the play-by-play descriptions of the National Football League's (NFL) National Conference football games. Accordingly, on February 17, 1994, Fox filed a § 325 application for cross-border electronic transmission.

Soon thereafter, Channel 51 filed a Petition to Deny the Fox application in accordance with § 325(c) and (d) and 47 C.F.R. § 73.3584(a). In this and subsequent filings, Channel 51 argued that XETV's informational programming, found deficient in the *ABC 1972* decision, was still deficient in 1994. Channel 51 conducted a two-week study of XETV's program listing in April 1994 and found that "the station had no news programs and no regularly scheduled issues-oriented programs." *Fox Television Stations, Inc.,* 10 F.C.C.R. 4055, 4060 (1995) [hereinafter *Fox*]. XETV's sole local program focused on "topics such as Mexican cooking rather than issues of public importance." *Id.* Furthermore, XETV had provided no coverage or information about recent San Diego floods and fires, California earthquakes, and the assassination in Tijuana of a candidate for the presidency of Mexico. *Id.*

On August 2, 1994, Fox filed a second § 325 application, seeking a permit to transmit the NFL games to station XHNUL–TV (now XHFTX) in Nuevo Laredo, Mexico, for rebroadcast in Laredo, Texas, and to station XHRTA–TV (now XHFOX) in Reynosa, Mexico, for rebroadcast in McAllen, Texas, and Brownsville, Texas. Although Channel 51 did not oppose this permit application, a Laredo, Texas, station did as to XHNUL–TV. However, no parties have appealed the FCC permit as to either XHNUL–TV or XHRTA–TV, so we do not reach those grants in our decision today. *See Lamprecht v. F.C.C.,* 958 F.2d 382, 389 (D.C.Cir.1992) (refusing to consider certain arguments brought by intervenor that expanded the case to new issues on grounds that the intervenor had decided not to appeal the FCC's denial of its construction application). Nevertheless, the licensees of the Nuevo Laredo and Reynosa stations have intervened in these proceedings in support of the FCC decision because of the potential impact of the court's decision on their future ability to obtain § 325 permits.

Because Fox anticipated a lengthy FCC decision process on its permit applications, it sought and obtained Special Temporary Authority (STA) to transmit the NFL games to XETV through the end of the 1994 season, or until the FCC ruled on its permit application, whichever came earlier. The FCC granted the STA request on August 11, 1994, and Fox transmitted the 1994 football games to XETV. On October 28, 1994, the FCC issued a brief Public Notice announcing that it had granted the Fox permit for five years. The FCC released its Memorandum Opinion and Order on January 24, 1995. *See Fox,* 10 F.C.C.R. at 4055.

In *Fox*, the FCC examined the applicability of the *ABC 1972* standards in light of the enactment of NAFTA. It began by acknowledging that it "at one time shared the view that we should apply all of the public interest criteria used in domestic proceedings to Section 325 proceedings," *id.* at 4064, but determined that, "in light of NAFTA, that conclusion is no longer valid." *Id.* NAFTA requires that "the primary criterion" for assessing the public interest, convenience and necessity in § 325 proceedings be "avoiding the creation or maintenance of electrical interference to U.S. broadcast stations," and that all public interest criteria be applied in § 325 proceedings "in the same manner as they would be applied to a domestic broadcast station application under section 309." NAFTA, Dec. 17, 1992, U.S.–Can.–Mex., Annex VI, Schedule of United States, 32 Int'l Legal Materials 289, 767 (1993); 1993 WL 574458, *3 [hereinafter NAFTA, Annex VI]. NAFTA also limits the FCC's authority by prohibiting it from considering a foreign station's nationality for purposes of favoring a competing United States station and by prohibiting it from conducting § 325 proceedings "in a manner that would constitute an unnecessary restriction on trade." NAFTA, Annex VI.

The FCC noted that it had denied the *ABC 1972* permit request because, among other things, "the Mexican station aired little to no programming meeting the local needs and interests of San Diego residents." *Fox,* 10 F.C.C.R. at 4060. It recognized that it still requires domestic station licensees to air locally oriented issue-responsive programming, and that NAFTA permits it to continue considering programming matters in § 325 proceedings. *Id.* However, it also concluded that, under NAFTA's restrictions

on the FCC's authority, the programming standards under § 325 must be more lenient than those applied in domestic license proceedings under § 309. After NAFTA, troublesome programming in a § 325 proceeding might include "programming that is obscene, indecent, illegal, [or that] encourages [the] use of harmful products or activities." *Id.* at 4066. But "[t]he types of programming allegations raised in the present proceeding, while potentially important with respect to a domestic station, would not generally create a substantial risk of public harm in the case of a foreign station." *Id.* The FCC accordingly granted Fox a § 325 permit. Channel 51 appeals the FCC's decision under 47 U.S.C. § 402(b)(6).

## III. Legal Analysis

■ NAFTA, which went into effect on January 1, 1994, as a treaty approved by Congress, is "the supreme Law of the Land." U.S. Const., Art. VI. The FCC contends that, though prior to NAFTA, its position was that "we should apply all of the public interest criteria used in domestic proceedings to Section 325 proceedings," *Fox,* 10 F.C.C.R. at 4064, it changed its position as a result of NAFTA, concluding that the locally oriented issue-responsive programming requirement is no longer relevant in the context of a § 325 permit application. We therefore do not consider whether the issue-responsive programming requirement is relevant in a § 325 proceeding, but only whether the FCC's reliance on NAFTA provides sufficient support for its departure from its prior interpretation of requirement-relevance in a § 325 proceeding.

■ "It is, of course, elementary that an agency must conform to its prior decisions or explain the reason for its departure from such precedent." *Gilbert v. N.L.R.B.,* 56 F.3d 1438, 1445 (D.C.Cir.1995) (citing *Greater Boston Tel. Corp. v. F.C.C.,* 444 F.2d 841, 852 (D.C.Cir.1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2229, 2233, 29 L.Ed.2d 701 (1971)), *cert. denied* —— U.S. ——, 116 S.Ct. 1261, 134 L.Ed.2d 210 (1995). In the instant case, the FCC finds four principles in NAFTA's Annex VI that allegedly support its position. First, the Annex requires that the "primary

criterion" for determining the public interest under § 325 be "avoiding the creation or maintenance of electrical interference to U.S. broadcast stations." But this language merely establishes electrical interference as the *primary* criterion to be considered—not the *only* criterion. This language certainly may affect the relative weight the FCC assigns to the issue-responsive programming requirement in § 325 proceedings, but it does not eliminate the issue-responsive programming criterion from consideration. Second, Annex VI directs that the FCC not consider a foreign station's nationality for purposes of favoring a domestic competitor. This provision clearly affects the FCC's *ABC 1972* holding that the presence of a domestic competitor willing to serve as a network affiliate weighs against granting a permit to a foreign station. However, the FCC does not explain why subjecting a foreign station to the same issue-responsive programming requirement to which domestic stations are subject constitutes discrimination against a foreign station on the basis of its nationality. Indeed, such an explanation would be well-nigh impossible to concoct.

Third, Annex VI requires that the FCC "apply the criteria for the grant of [a § 325] permit in the same manner as they would be applied to a domestic broadcast station application under section 309 of the Act." NAFTA, Annex VI. The FCC's argument here rests on the premise that the issue-responsive programming requirement is neither relevant nor necessary in a § 325 proceeding, apparently because it believes that NAFTA has made the requirement irrelevant by outlawing unnecessary trade barriers. The FCC might reasonably conclude that some § 309 domestic licensing requirements are irrelevant or should carry different weight in the § 325 context, but that is not the issue before us today. The FCC has already determined, in *ABC 1972,* that the issue-responsive programming requirement is relevant in a § 325 proceeding. If it is to depart from its prior ruling, it must provide a reasoned explanation. Citing NAFTA will not fulfill this need without a reasoned explanation of how that agreement eliminates the relevance of this requirement, which presumably exists to assure that events of local

interest and importance receive broadcast coverage. If the focus is on the quality of coverage of local events, the nationality of the broadcasting station should make little difference in determining whether the station meets the requirement.

Finally, the NAFTA Annex provides that no § 325 proceeding may be conducted in a manner constituting an unnecessary restriction on trade. In the FCC's view, of course, the "irrelevant" issue-responsive programming requirement is an "unnecessary" restriction on trade. But since the FCC has failed to show how the requirement has become irrelevant in a § 325 proceeding, we cannot find the requirement to be an "unnecessary" restriction on trade.

■ In its Memorandum Opinion and Order and in its brief in this court, the FCC attempts to support its reading of NAFTA by engaging in a rereading of Congress' original intent behind § 325. Claiming that NAFTA prompted this rereading, it argues that Congress never intended the issue-responsive programming requirement to apply in § 325 cases, and that "[t]he Commission could reasonably find that imposing requirements with respect to programming beyond what was necessary to address Congress' concerns in adopting Section 325 would constitute an unnecessary trade restriction under NAFTA." FCC Br. at 26. It is certainly permissible for FCC to change its existing interpretation of § 325, but it must provide a reasoned explanation for doing so. *Hall v. Baker*, 867 F.2d 693, 696 (D.C.Cir.1989). Here, as we have seen, FCC has failed to provide a reasoned explanation for its revised interpretation.

The FCC has misconstrued NAFTA's impact on § 325 proceedings. It has failed to demonstrate that either NAFTA or a rereading of congressional intent behind § 325 in light of NAFTA support its decision to change its policy. Accordingly, we hold that the FCC has failed to adequately explain its decision to depart from *ABC 1972*'s application of the issue-responsive programming requirement in § 325 proceedings.

The FCC also noted in its Memorandum Opinion and Order that "it is not clear to us that [XETV's] programming is indeed defi-

cient even under the standards currently applied to American broadcasters." *Fox*, 10 F.C.C.R. at 4067. However, although it observed that "XETV's current programming includes regular religious programs, public service announcements, and other programs that may qualify as issue-responsive," *id.*, it did not affirmatively hold that XETV meets the requirement. It is the FCC's job to make that judgment in the first instance; we cannot review today a decision as to whether XETV meets the issue-responsive programming requirement since the FCC has yet to make such a decision.

We stress that our holding today does not mean that XETV is ineligible as a matter of law for a § 325 permit. We also do not hold that NAFTA had no effect whatsoever on the relative importance of the issue-responsive programming requirement in § 325 proceedings. Nor do we pass judgment on the merits of XETV's issue-responsive programming. We simply conclude that the FCC erred in holding that NAFTA's Annex VI prohibits application of *ABC 1972*'s § 325 issue-responsive programming requirement.

## IV. Conclusion

In light of our holding that the FCC misinterpreted NAFTA's impact on the role of the issue-responsive programming requirement in § 325 proceedings, we vacate that portion of the FCC's Order that grants a § 325 permit to Fox for cross-border transmission to XETV. We remand the case to the FCC for treatment consistent with this opinion. *See* 47 U.S.C. § 402(h).